**YAMAHA MOTOR CORP.,
U.S.A., Plaintiff,**

v.

**Demerst B. SMIT, in his Official Capacity as the Acting Commissioner of the Department of Motor Vehicles and Jim's Motorcycle, Inc., d/b/a Atlas Honda/Yamaha Defendants.**

No. CIV.A. 3:01CV471.

United States District Court,
E.D. Virginia,
Richmond Division.

July 31, 2003.

J. William Boland, Esquire, Thomas E. Spahn, Esquire, Robert M. Tyler, Esquire, Laura R. White, Esquire, McGuireWoods LLP, Richmond, David P. Murray, Esquire, Wilkie Farr & Gallagher, Washington, D.C., for Plaintiff.

Walter A. Marston, Jr., Esquire, George E. Kostel, Esquire, Reed Smith LLP, Richmond, for Jim's Motorcycle.

Jeffrey A. Spencer, Esquire, Office of the Attorney General, Richmond, for Demerst Smit.

Bryan M. Haynes, Esquire, Troutman Sanders LLP, Richmond, James J. Briody, Esquire, Sutherland, Asbill & Brennan, Washington, D.C., for Harley–Davidson (Movant).

## MEMORANDUM OPINION

PAYNE, District Judge.

Yamaha Motor Corporation, U.S.A. ("Yamaha") is a California corporation that distributes motorcycles and related parts and accessories throughout the United States. Yamaha has approximately 1,200 authorized motorcycle dealers nationwide, twenty-six of which are located in the Commonwealth of Virginia. Defendant, Demerst B. Smit,[1] is the Commissioner of the Virginia Department of Motor Vehicles (the "Commissioner") and is responsible for administering the Motorcycle Dealer Chapter of the Code of Virginia (Va.Code Ann. §§ 46.2–1993 *et seq.*). Defendant, Jim's Motorcycle ("Atlas"), does

---

1. During the course of this action, Demerst B. Smit replaced Asbury W. Quillian as the Commissioner and an Order has been entered substituting the name of the new Commissioner.

business as Atlas Honda/Yamaha and is an existing dealer of Yamaha and Honda motorcycles in Bristol, Virginia. Amicus Curiae Harley–Davidson Motor Company, Inc. ("Harley–Davidson") is a motorcycle manufacturer that, like Yamaha, distributes motorcycles and related parts and accessories in the Commonwealth of Virginia, and, as such, has a direct interest in the outcome of this litigation.

In 2000, Yamaha decided to authorize a new motorcycle dealership in Rosedale, Virginia, approximately 26 miles away from Atlas. In October 2000, as allowed by Code of Virginia § 46.2–1993.67(5), Atlas filed a protest with the DMV against Yamaha's establishment of the Rosedale dealer.

Yamaha sought summary disposition of the protest, and on April 19, 2001, the Hearing Officer appointed to hear the protest issued a one-page order summarily finding that Atlas was entitled to a hearing and stating that such a hearing would be held at a mutually convenient time. On May 8, 2001, after confirming that the Hearing Officer's order represented the position of the Commissioner and was not subject to interlocutory appeal, Yamaha initiated a civil action in this Court challenging the validity of the second paragraph of § 46.2–1993.67(5) (the "Second Paragraph") under the dormant aspect of the Commerce Clause of the United States Constitution. *See* U.S. Const., art. I, § 8, cl. 3. Shortly thereafter, Yamaha agreed voluntarily to dismiss its federal action without prejudice upon learning from the Commissioner that the Hearing Officer did not, in fact, have authority to issue the order under protest and that the Commissioner intended to render a final decision

that might narrow the reach of the statute and thereby resolve some, if not all, of the federal constitutional issues. On July 6, 2001, the Commissioner issued his final decision wherein he found that Atlas was entitled to a hearing. One month later, on August 6, 2001, the Commissioner issued an amended decision (Yamaha Ex. 2 (the "Amended Decision")) that reached the same conclusions as the earlier decision, but clarified certain matters.

Yamaha filed a second federal complaint in this action on July 25, 2001 seeking a declaration that the Second Paragraph violates the dormant Commerce Clause, an injunction prohibiting the Commissioner from enforcing the Second Paragraph, and an award of attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.[2] Soon thereafter, the parties agreed to conduct a summary bench trial based on a stipulated factual record, and the Court conducted that bench trial on April 9, 2002.

After conducting the bench trial, the Court concluded that resolution of the constitutional questions depended on the proper interpretation of the Second Paragraph, and, finding no Virginia precedent respecting the proper interpretation, submitted four certified questions to the Supreme Court of Virginia on May 17, 2002. Those questions were:

1. Whether the Second Paragraph grants to every existing Virginia franchised dealer of a line-make of motorcycles the right to receive forty-five days' advance notice of, and to protest, the establishment of any new or additional motorcycle dealer franchise of the same line-make in any county, city or town of Virginia, thereby placing on the manu-

---

**2.** In October 2001, over two months after initiating the present federal action, Yamaha filed a "provisional" appeal of the Amended Decision in the Circuit Court of Washington County as a means of preserving any state law claims. Before any proceedings were conducted in that court, the parties agreed to stay the appeal pending the resolution of the present federal action.

facturer the burden of proving, in a formal evidentiary hearing, "inadequate representation" of its line-make of motorcycles throughout the Commonwealth before it may proceed to establish that dealership?

2. Whether the Commissioner was correct in interpreting the Second Paragraph in a manner such that only those protesting franchised dealers who make a preliminary showing that they actually are representing, "in a not insubstantial way," the line-make of motorcycles in the "county, city or town" where the proposed new or additional dealer would be located will qualify for a formal evidentiary hearing in which the manufacturer would bear the burden of proving "inadequate representation" of that line-make, by the protesting franchised dealer, in that "county, city or town?"

3. Whether the Second Paragraph should be interpreted to make the advance notice and protest rights granted therein applicable to only existing franchised dealers of a line-make of motorcycles which are located in the same "county, city or town" in which a proposed new or additional motorcycle dealer franchise of the same line-make would be established, and to limit the burden on the manufacturer to proving "inadequate representation" of its line-make merely in that "county, city or town?"

4. If none of the three aforementioned interpretations of the Second Paragraph is correct, what is the correct interpretation of the statute?

On June 12, 2002, the Supreme Court of Virginia accepted the questions, and, on November 1, 2002, issued an opinion that rephrased the questions, and then answered the rephrased questions. *See Yamaha Motor Corp. v. Quillian,* 264 Va. 656, 571 S.E.2d 122 (2002). At the request of the parties, the Court allowed additional discovery to be conducted on the question of the burdens placed on interstate commerce by the Second Paragraph, and conducted evidentiary hearings on February 14, 2003 and March 1, 2003. For the reasons that follow, the Second Paragraph does not violate the dormant aspect of the Commerce Clause; and, accordingly, the relief requested is denied.

## STATEMENT OF FACTS

### A. Background

#### 1. The Statute

Code of Virginia § 46.2–1993.67(5) protects Virginia's existing motorcycle dealers by regulating the ability of motorcycle distributors like Yamaha to open new dealers in the Commonwealth. This protective statute consists of two paragraphs, the "First Paragraph" and the Second Paragraph. Before 1997, the statute consisted only of the First Paragraph, a provision which was adapted almost entirely from Code of Virginia § 46.2–1569(4),[3] the analogous provision governing motor vehicle dealers generally, which itself was derived from the former Code of Virginia § 46.2–547(d). This lineage is important only because, as discussed below, the Fourth Circuit has previously considered a dormant

---

**3.** Code of Virginia § 46.2–1993.67 is part of the "Motorcycle Dealers Act," which was enacted in 1996, and is codified at § 46.2–1993 through 46.2–1993.82. Prior to 1996, the establishment and operation of motorcycle dealerships was regulated under the "Motor Vehicle Dealers Act," presently §§ 1500 through of 1582 of Title 46.2 of the Code of Virginia.

In enacting the Motorcycle Dealers Act, the General Assembly simply adapted the then existing provisions of the Motor Vehicle Dealers Act, transferring them almost verbatim into the new Act. Accordingly, prior to amendment in 1997, § 46.2–1993.67(5) was substantively identical to the corresponding provisions of the Motor Vehicle Dealers Act.

Commerce Clause challenge to § 46.1–547(d) and held that the automobile dealer progenitor of the First Paragraph did not violate the dormant Commerce Clause. *See American Motors Sales Corp. v. Division of Motor Vehicles,* 592 F.2d 219 (1979).

The First Paragraph places limitations on motorcycle manufacturers that intend to open new motorcycle dealerships in the "relevant market area" of an motorcycle existing dealer. The term "relevant market area" is defined in § 46.2–1993 as a circular area around the dealer with a 10, 15, or 20 mile radius, depending on the population density of the area. The First Paragraph (*i.e.,* the statute) provides, in relevant part, as follows:

> It shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch, or any field representative, officer, agent, or their representatives:
>
> . . .
>
> 5. To grant an additional franchise for a particular line-make of motorcycle in a relevant market area in which a dealer or dealers in that line-make are already located unless the franchisor has first advised in writing all other dealers in the line-make in the relevant market area. No such additional franchise may be established at the proposed site unless the Commissioner has determined, if requested by a dealer of the same line-make in the relevant market area within thirty days after receipt of the franchisor's notice of intention to establish the additional franchise, and after a hearing on the matter, that there is reasonable evidence that after the grant of the new franchise, the market will support all of the dealers in that line-make in the relevant market area.
>
> . . .

Thus, under the First Paragraph, an existing motorcycle dealer may protest the establishment of the putative new dealership if it is located in the existing dealer's relevant market area.

The First Paragraph is generally consistent with the dealer establishment laws of the other states. *See generally New Motor Vehicle Board v. Orrin W. Fox Co.,* 439 U.S. 96, 100–02, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978) (describing the movement that led to the establishment of such laws and collecting statutes from various states). As noted above, in *American Motors,* the Fourth Circuit held that the predecessor of the First Paragraph, § 46.1–547(d), was a valid exercise of state power that did not offend the dormant Commerce Clause. 592 F.2d at 222–24. This action does not involve the First Paragraph.

In 1997, the Virginia General Assembly added the Second Paragraph to § 46.2–1993.67(5) and, in so doing, significantly broadened the scope of protection afforded to Virginia's existing motorcycle dealers. The Second Paragraph achieved that result by granting protest rights to all existing dealers of the manufacturer's line-make whenever a manufacturer seeks to open a dealership anywhere in the Commonwealth, even where the location of the proposed new dealership is outside the relevant market area of the protesting dealer. The Second Paragraph provides that:

> No new or additional motorcycle dealer franchise shall be established in any county, city or town unless the manufacturer [or] distributor . . . gives advance notice to *any existing franchised dealers of the same line-make.* The notice shall be in writing and sent by certified mail, return receipt requested, at least forty-five days prior to the establishment of the new or additional franchise. *Any existing franchise dealer may file a protest within thirty days of the date the notice is received.* The burden of proof

in establishing inadequate representation of such line-make motorcycles shall be on the manufacturer [or] distributor[.]

(emphasis added.) In answering this Court's certified questions, the Supreme Court of Virginia clarified the scope and effect of the Second Paragraph. *See Yamaha,* 571 S.E.2d at 126–28. First, the Supreme Court construed the term, "any existing franchise dealer" used in the first sentence of the paragraph to mean "any existing dealer of the same line-make of motorcycles in the Commonwealth of Virginia." *Id.* at 127. Second, the Supreme Court held that the geographic area wherein the manufacturer must prove inadequate representation is the geographic market area likely to be served by the new dealer. *Id.* at 126, 127. Therefore, under the statute itself, as interpreted by the Supreme Court of Virginia, any existing dealer in a particular line-make can protest the proposed opening of a new dealership in that line-make anywhere in the Commonwealth, whether or not the new dealership is within the "relevant market area" of the protesting dealer. And, in order to survive the protest, the manufacturer must show inadequate representation in the market area likely to be served by the new dealer. The Second Paragraph, thusly interpreted, undeniably gives existing dealers of motorcycles significantly increased protection over and above that provided in the First Paragraph. It is undisputed that the Second Paragraph has no parallel in the law of any other state.

The General Assembly made no statement of purpose in amending the statute to add these protections. There is some evidence in the record that suggests that the amendment was promoted by the Virginia Motorcycle Dealer's Association ("VMDA"),[4] a scenario that is highly plausible given the significantly added protection that the Second Paragraph affords VMDA's members. However, because Virginia does not retain legislative history and because the General Assembly did not recite its purpose in the text of the statute, there is no direct evidence of legislative intent. Notwithstanding the lack of direct evidence of intent, the clear effect of the statute's text is to confer added protection on existing dealers by allowing protests by dealers outside the geographic limits set by the First Paragraph. And, the Second Paragraph is part of a statute that is modeled directly upon a similar statute that the Fourth Circuit has interpreted to be a dealer protective statute. Thus, both the context of the Second Paragraph and the obvious consequences of its text disclose a protective legislative intent.

Also, the record contains evidence that, although the First Paragraph's relevant market area mileage circles are the same as those that apply for automobile dealers, *see* Va.Code §§ 46.2–1500 and 46.2–1509(4), there were, in 1997, significantly fewer motorcycle dealers than there were automobile dealers. Consequently, the average motorcycle dealer's geographic market seems to have been significantly larger than that of the average automobile dealer. (*See* Yamaha Ex. 2 at 4–5.) In addition, in 1997, motorcycle sales were increasing generally and demand was outstripping

---

**4.** The only real evidence respecting the role of the VMDA in the passage of the Second Paragraph is the following statement of Steven Stupasky, DMV's Vehicle Services Administration Lead Analyst, in an oral report to the Franchise Law Committee of the Virginia Motor Vehicle Dealer Board: "Now I don't know how the hearing officer and courts are going to interpret [the Second Paragraph] *but what the motorcycle association intended was …*" (Yamaha Ex. 3 at Y01029–30.) From this statement, one arguably could infer that Stupasky, a person in a position to know, believed that the Second Paragraph was drafted either by, or at the behest of, the VMDA.

496

supply. (Yamaha Ex. 11 at ¶ 13.) This general market climate led motorcycle dealers in Virginia and elsewhere to complain to manufacturers about receiving insufficient numbers of top-selling units. (*Id.*) These facts were available to the General Assembly at the time it passed the Second Paragraph, and, taken together, they could lead a reasonable person to conclude that protections beyond those provided by the First Paragraph were necessary.

## 2. The Development Of A Procedure For Resolving Second Paragraph Protests

For reasons unknown, the Commissioner did not enforce the notice requirements of the Second Paragraph until late 1999. Then, in November 1999, at least in part at the behest of the Virginia Motorcycle Dealers Association ("VMDA"), (*see* Yamaha Ex. 1), the Commissioner sent a reminder letter to motorcycle manufacturers that re-iterated the requirements of the Second Paragraph. (Joint App. Ex. 13 at Ex. C.) Since that time, the Commissioner has actively enforced the Second Paragraph. Unfortunately, however, the Commissioner did not formulate in advance any procedures for resolving Second Paragraph protests or attempt in any way to interpret the Second Paragraph. As a result, the Commissioner was compelled to craft the procedures for Second Paragraph protests on the fly while attempting to resolve the protests lodged in late 1999 after he began enforcing the notice requirement.

Accordingly, from November 1999 to February 2003, the Commissioner gradually developed procedures for resolving pro-

tests under § 46.2–1993.67(5) on a case-by-case basis. The test case for the Commissioner, in many respects, was Atlas's protest of Yamaha's planned opening of the Rosedale dealership. As discussed below, that case provided the Commissioner the opportunity to interpret the ambiguous provisions in the statute and formulate a process for resolving protests.

Atlas lodged its protest with the Commissioner in October 2000 upon learning that Yamaha intended to establish a new dealer in Rosedale, Virginia. Rosedale is in Russell County and is approximately 26 miles as the crow flies from Atlas's existing dealership in Bristol, Virginia, and outside Atlas's relevant market area as defined in the First Paragraph. Because this was the first case in which a dealer had pressed a Second Paragraph protest,[5] the Commissioner, in the course of addressing the protest, interpreted extensively the rather inartfully-crafted Second Paragraph and developed procedures for resolving future Second Paragraph protests. Therefore, the Atlas protest is relevant not only because it gives rise to this action, but also because it offers some insight into the Commissioner's thinking in establishing the process now in place.

On November 8, 2000, the Commissioner allowed the Atlas protest to proceed and appointed a Hearing Officer. After the parties agreed that any protest by Atlas must be limited to the Second Paragraph, (Yamaha Ex. 1 at ¶ 20), Yamaha sought summary disposition of the protest based on its interpretation of the statute. Yamaha urged the Hearing Officer to interpret the Second Paragraph to limit notice and protest rights to existing dealers located in

**5.** Before the Atlas protest, V–Twin Acquisitions Inc., d/b/a Cycle Sport Unlimited ("Cycle Sport") protested the establishment of a new dealer in Leesburg Virginia. (Yamaha Ex. 11 at ¶ 15.) The Commissioner granted

Cycle Sport a formal adversary hearing, but before the Commissioner could hold that hearing, Cycle Sport withdrew the protest. (*Id.* at ¶ 17.)

the same "county, city or town" as the proposed dealer. Yamaha also argued that the manufacturer's burden of proving "inadequate representation" of its line-make should be similarly limited to the relevant "county, city or town." (Yamaha Ex. 15.)

On August 6, 2001, the Commissioner issued the Amended Decision, wherein he both interpreted the Second Paragraph and established the procedures for resolving future Second Paragraph protests. The Commissioner began the Amended Decision by assessing the purpose of the General Assembly in enacting the Second Paragraph:

> Although the language is not as artfully drawn as might have been desirable, it is clear that the primary objective of [the Second Paragraph] was to afford added protection to motorcycle dealers, above and beyond the relevant market area protection provided by [the First Paragraph]. It is not entirely clear why such additional protection was provided only in the motorcycle dealer provisions and not in the motor vehicle dealer provisions (Va.Code § 46.2–1569), but presumably the 10, 15 and 20 mile limits on the definition of relevant market area applicable to both motorcycles and motor vehicles (*compare* Va.Code § 46.2–1500 to § 46.2–1993) might be considered less meaningful geographic limits for motorcycle dealers because there are far fewer franchised motorcycle dealers than motor vehicle dealers in Virginia.

(Joint App. Ex. 2 at 4–5.) The Commissioner then noted that, in accordance with the Reminder Letter sent to all motorcycle manufacturers, the Second Paragraph required that notice be sent to all existing dealers of a particular line-make throughout the Commonwealth, not merely the existing dealers in the same "city, county or town" as Yamaha had urged. (*See id.* at 5.)

Having resolved that the Second Paragraph allowed every existing dealer in the Commonwealth the right to protest, the Commissioner then held that not every protest merited a formal evidentiary hearing on the issue of inadequate representation. (*Id.* at 5–6.) Rather, a formal hearing would only be permitted where a protesting dealer makes a preliminary showing in an informal fact-finding proceeding, prior to the appointment of a hearing officer, that it actually represents, "in a not insubstantial way," the line-make of motorcycles in the "county, city or town" where the new dealer would be located. (*Id.* at 6.) A protesting dealer can meet this burden only by proving that it "actually represents the line-make by having a *not insubstantial number of sales*" in the relevant country, city or town. (*Id.* at 8 (emphasis added).) The Commissioner then concluded that the relevant geographic market for the purpose of determining the ultimate issue of inadequate representation at the formal evidentiary hearing was to be the "county, city or town" in which the manufacturer intended to open the new franchise, rather than the area likely to be served by the new dealer as Atlas had urged.[6] (*Id.* at 7.)

Having interpreted the statute and fleshed out the protest procedures, the Commissioner then concluded that Atlas actually represented the Yamaha line-make in Russell County by conducting a not insubstantial number of sales (14) to customers in Russell County during the

---

6. As noted above, the Supreme Court of Virginia has since held that the relevant geographic market for the purpose of determining the ultimate issue of inadequate representation is the geographic area likely to be served by the new dealer, not the county, city or town of the new dealer. *Yamaha*, 571 S.E.2d at 126, 127.

calendar years 1997, 1998, 1999 and 2000. (*Id.* at 9.) The Commissioner noted that the 14 Yamaha motorcycles sold to consumers in Russell County represented 6% of Atlas's Yamaha brand sales, and 58% of the total Yamaha brand sales in Russell County. (*Id.*) Based on these figures, the Commissioner determined that "Atlas does actually represent the Yamaha line-make in Russell County and that representation is not insubstantial or de minimus or incidental or accidental[,]" and as a consequence, Atlas was entitled to a formal evidentiary hearing on the question of inadequate representation. (*Id.* at 9–10.)

Finally, although not necessary to decide whether Atlas was entitled to bring a Second Paragraph protest, the Commissioner took the opportunity to comment on the term "inadequate representation" in order to guide the decision-makers in further proceedings. (*Id.* at 10–13.) The Commissioner was unable to ascertain a precise definition, but he did find that the following factors—adapted from subsection D of § 46.2–1993.73, which lists factors relevant to the determination of whether there is "good cause" for a proposed action initiated by a person under subdivisions 3, 4, 5, 6, and 9 of § 46.2–1993.67—to be relevant:

1. The volume of the affected dealer's business in the county, city or town wherein the proposed dealer would be located;

2. The nature and extent of the dealer's investment in its business in or related to that county, city or town;

3. The adequacy of the dealer's service facilities, equipment, parts, supplies, and personnel as they relate to residents of that county, city or town;

4. The effect of the proposed action on the county, city or town;

5. The extent and quality of the dealer's service under motorcycle war-

ranties for the residents of that county, city or town;

6. The dealer's performance under the terms of its franchise in or related to that county, city or town; . . .

7. Other economic and geographical factors reasonably associated with the proposed action[; and]

[8. The market penetration of the protesting dealer into the county, city or town wherein the prospective dealer intends to locate.]

(*Id.* at 11–12.) The Commissioner closed with the observation that:

I recognize that this interpretation may mean that existing dealers located outside the county, city or town where in the proposed dealer is to be established will be less likely to qualify for protection under [the Second Paragraph] (as compared to existing dealers located within that county, city or town), but I believe that may well have been the intended result. In any event, *I believe that it is the volume of vehicles sold and the market penetration in the county, city or town where the new dealership is to be established that should be the primary consideration in proving whether the protesting dealer is providing "inadequate representation."*

(*Id.* at 12 (emphasis added).)

### 3. The Procedure Applied: The Harley–Davidson Protest

On May 14, 2002, Harley–Davidson sent notice to its Virginia dealers that it intended to authorize a new dealership in Prince George County, Virginia. (Quillian Ex. 3 at 2.) On June 12, 2002, H.D. Motorcycles Sales Inc., which does business under the name Richmond Harley–Davidson and South Richmond Harley–Davidson ("HDM"), filed a protest under both the First and Second Paragraphs. (*Id.* at 1.) The Commissioner then requested that the

parties submit information relevant to two preliminary questions: (1) whether the proposed dealership was within HDM's relevant market area, therefore entitling HDM to a hearing under the First Paragraph; and (2) whether HDM represented the Harley–Davidson line-make in Prince George County in a not insignificant or insubstantial way, thereby entitling HDM to a formal evidentiary hearing under the Second Paragraph. (*Id.* at 1–2.)

The parties submitted this information, and, on August 27, 2002, the Commissioner issued his decision. The Commissioner first concluded that the proposed dealer was not within HDM's relevant market area, and therefore HDM was not entitled to a formal evidentiary hearing under the First Paragraph. Next, the Commissioner concluded that HDM, in fact, represented the Harley–Davidson line-make in a not insignificant or insubstantial way, and thereby authorized a formal evidentiary hearing on the question of adequate representation. (*Id.* at 3.)

Several aspects of the Commissioner's ruling respecting the extent of HDM's penetration into the Prince George County market are noteworthy. First, as in the Atlas challenge, the parties presented conflicting evidence respecting the extent of the protesting dealer's sales in the county, city or town of the prospective dealer. (*Id.* at 3.) Rather than resolve the factual dispute, the Commissioner concluded that even the lower figure, which showed market penetration by HDM into Price George County geographic market for Harley–Davidson motorcycles of 14.9% in 1999, 15.9% in 2000, and 16.7% in 2001, constituted "a not insignificant or insubstantial" level of representation, thereby warranting a formal evidentiary hearing. (*Id.* at 3, 5.)

Second, and likewise similar to the Atlas challenge, the Commissioner noted that, even if the lower figure did not rise to the level of not insubstantial representation,

he nevertheless would have authorized a formal evidentiary hearing to resolve the factual dispute respecting representation. (*Id.* at 5.) In other words, the Commissioner has interpreted the Second Paragraph to mean that the protesting party only need produce some evidence showing that it sold a not insignificant number of motorcycles in the county, city or town, whether or not that data is corroborated by evidence proffered by the manufacturer.

### 4. The Procedure Refined: The Commissioner's February 26, 2003 Letter To Motorcycle Manufacturers And Dealers

Based on his experience with the Atlas and HDM protests, and in light of the Supreme Court of Virginia's November 1, 2003 opinion respecting this Court's certified questions, the Commissioner sent a letter to all motorcycle manufacturers and dealers on February 26, 2003 that refined the procedures for Second Paragraph protests. First, the Commissioner explained that the notice sent to existing dealers must contain certain minimum information, including:

(1) the franchisor's present intent to establish a new franchise dealer of the franchisor's line-make;

(2) the street address or, if no street address is available, a reasonable approximation of the street address, or precise location where the newly proposed new dealer is intended to be established;

(3) the name of the county, city or town in which the proposed new dealer is intended to be established; and

(4) whether or not the proposed new dealer will be located within the relevant market area of the dealer being notified.

(Quillian Ex. 5 at 2.) The critical information in this notice, explained the Commis-

sioner, is the proposed site for the new dealer:

> [T]he notice must be provided at a time when the franchisor's intent has at least progressed to the point that a proposed site has been identified by the franchisor, and the proposed site must be identified in the notice by a street address where possible and the name of the county, city or town where the proposed new franchise dealer is to be established ... [B]ecause statutory protections for existing dealers are tied to geographical locations, the notice concerning the proposed establishment of a new franchise dealer must be specific as to the franchisor's intent to establish the new franchise dealer and the intended location of the new franchise dealer.

(*Id.*) The Commissioner then emphasized that such notice must be sent at least 45 days prior to the establishment of the new dealership, and that the 30–day time period for existing dealers to request a hearing or to file a protest would not begin to run until the franchisor has notified the Commissioner that it has satisfied the notice requirements. (*Id.*)

Second, the Commissioner dictated separate procedures for resolving protests arising under the First and Second Paragraphs and explained that a protesting dealer must specify whether its protest arises under the First or Second Paragraphs. For Second Paragraph protests, the dealer, at a minimum, must provide, as part of the protest, information showing, *inter alia,* the number of units the dealer has sold to residents of the county, city, or town where the new dealer will locate. The manufacturer then would have two weeks to contest the request for a hearing by submitting specific types of sales and market share information for the preceding three years to show any asserted inadequate representation. In addition, the Commissioner stated that parties would be allowed to submit additional information in support of their positions for four weeks after the date on which the DMV received the protest, with little or no restrictions— *i.e.,* the type of information the parties may submit at this point is almost entirely open-ended, with the only condition being that the party submitting the additional information must explain why it is relevant. (*Id.* at 5; 3/1/03 Tr. (Testimony of Jo Anne Maxwell) at 372:24—375:4.)

Next, the Commissioner explained that, within 40 days of the receipt of the protest (or, 12 days after receiving all relevant information from the parties), the Commissioner would determine whether to grant a formal evidentiary hearing, with the standard presumably being that which the Commissioner had applied in the Harley-Davidson protest. If the Commissioner grants a hearing, that hearing would be held within 90 days of the protest. (*Id.* at 5.)

Finally, the Commissioner modified the inquiry to be conducted at any formal evidentiary hearing in light of the opinion of the Supreme Court of Virginia. Rather than inquiring whether there is inadequate representation in the county, city or town where the prospective dealer would be located, the Commissioner would decide, as instructed by the Supreme Court, "whether there is inadequate representation of the line-make in the market area likely to be served by the new franchise dealer." (*Id.* at 5.)

## B. The Practical Effect Of The Statute As Enforced By The Commissioner

The Second Paragraph, and the procedures that the Commissioner has adopted to enforce it, create a significant hurdle for manufacturers and their prospective new dealers. Although, at first blush, the Commissioner seems to have created a procedure that allows for non-meritorious protests to be disposed of within 40 days of

the filing of a protest and five days before the dealer intends to open, the reality is not that simple. First, the Commissioner's track record in efficiently resolving protests under both the First Paragraph and the analogous provision respecting the establishment of automobile dealerships is not good. (*See* Quillian Ex. 6.) Indeed, the Commissioner frequently has failed to meet the 90–day limit set by statute for resolving those protests. (3/1/03 Tr. (Maxwell) at 274:1–278:9, 320:10–321:14, 333:8–335:8.) Therefore, the Commissioner's promise to resolve Second Paragraph protests in a timely manner rings rather hollow. Second, Virginia's Administrative Procedures Act allows a protesting dealer to appeal a decision denying a formal evidentiary hearing to a Virginia Circuit Court, and then to the Virginia Court of Appeals, a process that could take years. (3/1/03 Tr. (Maxwell) at 354:23–355:12.) Therefore, even a frivolous protest to which the Commissioner responds with uncharacteristic dispatch could take years to resolve.

Finally, the standards for determining whether a hearing should be granted and whether a protest should be upheld are highly subjective. Respecting the degree of market penetration into the county, city or town of the prospective dealer that a protesting dealer must show in order to get a formal evidentiary hearing, the commissioner has not provided clear guidance. The "not insubstantial" representation standard is remarkably vague, and the Commissioner's decisions on the Atlas and HDM protests provide little additional explanation. At most, manufacturers know that an existing dealer with a market penetration of as little as 14.9% may satisfy the standard. But, although the 14.9% figure relied upon in the HDM protest was the percentage of new motorcycle sales by HDM in the county, city or town of the new dealer, the Commissioner has indicated that new motorcycle sales *may* not be the only relevant factor. Other "relevant" information such as sales of used motorcycles, warranty and other service visits, or even advertising, may also be considered. (3/1/03 Tr. (Maxwell) at 372:14–374:13; Yamaha Ex. 25 at 32:17–35:14; Yamaha Ex. 27 at 5–6.) To complicate matters further, the Commissioner has demonstrated in both the HDM and Atlas protests that, in determining whether or not to grant a hearing, the protesting dealer will be given the benefit of the doubt in cases where the parties present inconsistent data respecting "not insubstantial" representation. As a consequence, a manufacturer cannot predict with any certainty whether any of the potential protests that might result from an attempt to open a new dealership will actually advance to the formal evidentiary hearing phase, (Yamaha Ex. 25 at 151:18–153:23), and must assume that, given the lack of a clearly defined standard and the Commissioner's bias in favor of granting the hearing, that it will be subjected to the full administrative process, the result of which can be contested in subsequent judicial proceedings.

The fact that a frivolous protest could tie up a manufacturer and prospective dealer for months takes on greater significance when one takes into consideration Yamaha's method of allocating motorcycles to its dealers. For reasons not relevant to the present case, Yamaha, like other motorcycle manufacturers, uses a national allocation program to distribute motorcycles to its dealers, based primarily on product availability and the dealer's prior sales. (2/14/03 Tr. (Testimony of Dennis McNeal) at 51:25–53:11; *id.* (Testimony of Gene Ostrom) at 119:7–120:8.) Because demand for motorcycles has outstripped Yamaha's production capabilities in recent years, (*id.* (McNeal) at 9:10–11:11), dealers are constantly in need of top-selling models. But, because allocations are set through the national allocation system, dealers cannot

simply order more top-selling units, but rather may receive units only in accordance with the national allocation program. (*Id.* (McNeal) at 21:13–23:22.) Therefore, existing dealers are constantly seeking from the manufacturers additional allocation of the best-selling products. (*Id.* (McNeal) at 11:6–11:11.)

Given the tight supply of top-selling units, an existing dealer has the economic incentive to file a protest of questionable merit in order to gain bargaining leverage. Both expert economists that testified in this case, Dr. Nancy Lutz for Yamaha, and Dr. Michael J. Ileo for the Defendants, concluded that given the constant demand for more product, existing dealers have the incentive to file a protest, whether meritorious or not, to create leverage to extract more product from the manufacturer. (*Id.* (Testimony of Nancy Lutz) at 196:23–198:13; Yamaha Ex. 24 at 63:2–63:18.) The HDM protest provides the paradigm of a dealer using a protest as leverage. As noted above, HDM protested Harley–Davidson's proposed establishment of a new dealer, even though the proposed new dealership was outside the relevant market area as defined in the First Paragraph. In an offer to settle its Second Paragraph protest, HDM offered to drop its protest in exchange for a sixty percent increase in motorcycle allocation to its current dealership location, and conversion of a secondary retail location into a full dealership, which would result in additional motorcycle allocations for that store. (2/14/03 Tr. (Ostrom) at 115:21–117:5, 156:5–157:8.) Harley–Davidson refused to accede to HDM's demand, and the protest remains unresolved to this date, (*id.* (Ostrom) at 117:3–117:5), but the HDM protest nonetheless demonstrates the economic incentive for existing dealers to file protests, and supports the conclusion that Second Paragraph protest are virtually certain to occur every time a manufacturer seeks to open a new dealership in the Common-

wealth, if only as a means of creating bargaining leverage.

The virtual certainty of a protest is exacerbated by the fact that, as described above, prospective dealers must have identified a definite location for their business prior to sending out notice. (Quillian Ex. 5 at 2.) Unfortunately, the uncertainty surrounding the protest process makes it difficult for prospective dealers to make the commitment necessary to secure such a location, either through a lease, option to buy, or outright purchase of the location. (2/14/03 Tr. (McNeal) at 60:9–61:3.) Even though the Commissioner does not technically require the prospective dealer to have secured a physical street address in order to survive a protest, prudence would dictate that he do so in order to prevent another individual from taking the proposed location during the protest period. (3/1/03 Tr. (Maxwell) at 336:21–338:10.) Indeed, the Commissioner's key witness on the procedures, Ms. Maxwell, testified that, in reality, the new site had to be under the proposed new dealer's control. (*Id.* (Maxwell) at 337:15–338:10.) But, without commitment letters from manufacturers, which the manufacturers would be reluctant to provide when a protest is a virtual certainty, prospective dealers are unlikely to be able to secure the financing necessary to secure a location. (2/14/03 Tr. (McNeal) at 61:6–61:16; *id.* (Testimony of Robert Braun) at 87:3–87:25.)

As a result of these economic realities, both Yamaha and Harley–Davidson have decided to forego establishing new dealers in Virginia and, instead, to devote their capital and business expansion efforts in other states. (*Id.* (McNeal) at 24:6–24:22; *id.* (Braun) at 88:5–88:13; *id.* (Ostrom) at 129:17–130:17.) Yamaha has identified three qualified dealer prospects in Virginia, including the prospective Rosedale dealer, but has decided not to pursue those

opportunities because of the burdens imposed by the Second Paragraph. (*Id.* (McNeal) at 24:6–24:11; *id.* (Braun) 85:16–87:25; Yamaha Exs. 20 & 21 (filed under seal).) Harley–Davidson similarly has foregone opportunities (apart from the prospective Prince George County dealer presently under protest) to open new dealerships in Virginia, instead opting to devote its resources into opening new dealerships in states with more favorable dealer establishment laws. (2/14/03 Tr. (Ostrom) at 129:17–130:7, 130:17–131:4.) Both Yamaha and Harley–Davidson made these decisions notwithstanding that demand for motorcycles continues to increase.

One consequence of the decisions by Yamaha and Harley–Davidson to forego attempts to open new distribution points during a period of increasing demand is a relative reduction in intrabrand and interbrand competition. As a matter of economic theory, one would expect such reductions to lead to higher prices for consumers. (2/14/03 Tr. (Ostrom) at 131:13–132:25; *id.* (Lutz) at 210:20–211:11, 221:24–222:12.) However, notwithstanding the thoroughly uncontroversial nature of this conclusion as a matter of economic theory, there is no evidence in the record that the reduction in intrabrand and interbrand competition actually has resulted in higher prices for Virginia consumers.

Furthermore, there is no record evidence indicating that the inability of Yamaha and Harley–Davidson to open new dealerships in the present regulatory climate has had any effect whatsoever on the sale of motorcycles in the Commonwealth. In 1996, 7123 total motorcycles were sold in Virginia. (Atlas Ex. 8 at Y00206.) In the first eleven months of 2202, 19,205 total motorcycles were sold in Virginia, (Atlas Ex. 12 at Y00230), an increase approaching 300%. And, Yamaha itself has done well. Even though it has had to rely on its existing dealer network, Yamaha's Virginia sales have more than tripled, (2/14/03 Tr. (McNeal) at 42:25; Atlas Exs. 8 & 12), while Yamaha's national sales have only roughly doubled. (2/14/03 Tr. (McNeal) at 38:24.) Of course, it is impossible to know what Yamaha's numbers would have been had it been able to open new points of distribution, and executives at Yamaha certainly believe that had they been able to open three new distribution points, they would have delivered more product into the Commonwealth. (2/14/03 Tr. (McNeal) at 24:20–24:22; *id.* (Braun) at 88:1–88:3.) Nevertheless, the concrete evidence suggests not only that Yamaha's existing dealer network has been adequate to meet growing consumer demand, but also that this network has outperformed Yamaha's nationwide network.

The foregoing facts provide the framework within which to assess Yamaha's contention that the Second Paragraph offends the dormant Commerce Clause.

## DISCUSSION

 The Commerce Clause of the United States Constitution empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const., Art. I, § 8, cl. 3. Although phrased as a grant of power to Congress rather than a restriction on the powers of the several States, the Supreme Court has held repeatedly that the Commerce Clause "directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma,* 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992); *see New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302, (1988); *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 93 L.Ed. 865 (1949); *Welton v. Missouri,* 91 U.S.

275, 280–81, 23 L.Ed. 347 (1875). This is so because the primary objective of the Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *General Motors Corp. v. Tracy,* 519 U.S. 278, 299, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997); *see also* The Federalist No. 42 (J. Madison).[7] "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, . . . has as its corollary that the states are not separable units." *H.P. Hood & Sons,* 336 U.S. at 537–38, 69 S.Ct. 657. Therefore, "the Commerce Clause . . . 'denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.'" *Waste Management Holdings, Inc. v. Gilmore,* 252 F.3d 316, 333 (4th Cir.2001) (quoting *Oregon Waste Sys., Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)).

■ In evaluating whether a state has exceeded the restrictions of the "negative," or "dormant," aspect of the Commerce Clause, courts apply a two-tiered approach, under which the level of scrutiny to which the enactment is subjected depends upon whether the statute discriminates against interstate commerce. *C & A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383, 390, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). The first tier is a *per se* rule of invalidity that applies where a state law discriminates facially, in its practical effect, or in its purpose. *Environmental*

*Tech. Council v. Sierra Club.* 98 F.3d 774, 785 (4th Cir.1996). In order for a law to survive the *per se* rule, "the state must prove that the discriminatory law is demonstrably justified by a valid factor unrelated to economic protectionism, and that there are no nondiscriminatory alternatives adequate to preserve the local interests at stake[.]" *Id.* (internal citations and quotation marks omitted); *accord Brown & Williamson Tobacco Corp. v. Pataki,* 320 F.3d 200, 209 (2d Cir.2003); *McNeilus Truck and Mfg., Inc. v. Ohio,* 226 F.3d 429, 442 (6th Cir.2000).

Where the state law does not discriminate either facially, in purpose, or in practical effect, but nonetheless indirectly affects interstate commerce, the second tier applies. Under the second tier, the court must balance the burden on commerce against the local benefits. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.*

Here, Yamaha has alleged that the Second Paragraph violates both the *per se* rule and the *Pike* balancing test. According to Yamaha, the Second Paragraph is discriminatory in purpose and effect, and the burden on interstate commerce created by the Second Paragraph clearly ex-

---

**7.** As the Supreme Court has noted,
> [t]he "negative" aspect of the Commerce Clause was considered the more important by the "father of the Constitution," James Madison. In one of his letters, Madison wrote that the Commerce Clause "grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventative

provision against injustice among the States themselves, rather than as a power to be used from the positive purposes of the General Government."
*West Lynn Creamery v. Healy,* 512 U.S. 186, 193 n. 9, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, p. 478 (1911)).

ceeds the putative local benefits that it may provide.

## A. Whether the Second Paragraph Discriminates Against Interstate Commerce In Its Purpose Or Practical Effect

As mentioned above, a plaintiff challenging a statute under the dormant Commerce Clause may prove that the provision is discriminatory by proving (1) that the provision discriminates on its face; (2) that the purpose of the statute is discriminatory; or (3) that the practical effect of the statute is discriminatory. *Waste Management Holdings*, 252 F.3d at 333. Here, the parties seem to agree, and correctly so, that the Second Paragraph is facially neutral. By its own terms, the Second Paragraph makes no distinction between in-state and out-of-state manufacturers or dealers. Therefore, the Second Paragraph is discriminatory, if at all, in its purpose or in its practical effect, or both.

### 1. Legitimate State Purpose

As explained above, the purpose of the General Assembly in enacting the Second Paragraph is not entirely clear, but the principal effect of the provision is to give existing dealers of motorcycles increased protection against the opening of new points of distribution by manufacturers. That, and the fact that the Second Paragraph was added to a statute that the General Assembly is presumed to have known to be a motorcycle dealer protective device because of a previous Fourth Circuit decision, is sufficient to permit the conclusion that the General Assembly intended to confer on motorcycle dealers a kind of protection that was both greater than that afforded under the First Paragraph and greater than that afforded automobile dealers. Given the state of the market for new motorcycles at the time the provision was passed and the fact that the existing protections were plausibly less effective than the protections available to automobile dealers, it is plausible that the General Assembly acted with the purpose of achieving increased protection for motorcycle dealers. This conclusion confirms the independent observations of both the Supreme Court of Virginia and the Commissioner that "the primary objective of [the Second Paragraph] was to afford added protection to motorcycle dealers, above and beyond the relevant market area protection provided by [the First] Paragraph." *Yamaha*, 571 S.E.2d at 127 (quoting the Amended Decision) (alterations in original). Obviously, the Supreme Court and the Commissioner based their assessments of purpose on the effect of the Second Paragraph and its place in a protective statutory scheme because there is no other record evidence to support that assessment.

The legitimacy of this general purpose is largely resolved by the decision in *American Motors*, 592 F.2d at 222–23, wherein the Fourth Circuit considered a dormant Commerce Clause challenge to an earlier version of § 46.2–1993.67(5) (respecting automobile dealers) that is substantially similar to the First Paragraph. Relying on the Supreme Court's decision in *Orrin W. Fox Co.*, 439 U.S. at 100–08, 99 S.Ct. 403, the Fourth Circuit held that, in light of the "disparity in bargaining power between automobile manufacturers and their dealers," states may legitimately enact legislation to "protect[ ] the equities of existing dealers by prohibiting manufacturers from adding dealerships to the market areas of its existing franchisees, where the effect of such intra-brand competition would be injurious to the existing franchisees and to the public interest" in furtherance of the legitimate state purpose of "the promotion of fair dealing and the protection of small business." *American Motors*, 592 F.2d at 222 (citing *Orrin W. Fox Co.*, 439 U.S. at 100–02, 99 S.Ct. 403) (internal quotation marks omitted). Stated

differently, "the state legislature 'was empowered to subordinate the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices.'" *Id.* (citing *Orrin W. Fox Co.,* 439 U.S. at 107, 99 S.Ct. 403). The General Assembly's purpose in modifying § 46.2–1993.67(5) was the same as that behind the original statute found to be legitimate in *American Motors.* To be sure, the General Assembly has decided to employ new means to achieve that purpose, but the purpose itself remains the same.

Yamaha argues that the manner in which the Second Paragraph has come to be enforced indicates that the intent behind it was protectionist, and therefore illegitimate. Although Yamaha is correct that the VMDA lobbied the Commissioner successfully to enforce the requirements of the Second Paragraph (Yamaha Ex. 1), and that the VMDA has lauded the protections afforded by the provision (Yamaha Ex. 2), that evidence is neither relevant to the question of legislative intent, nor indicative of any deviation from the purpose identified in *American Motors.* The focus of the inquiry here is on the intent of the legislature, not the intent of state executives, and Yamaha's observation that the active enforcement of the statute was brought about by the lobbying efforts of the VMDA provides no insight into the intent of the legislature. Furthermore, even if this evidence were relevant to the question of legislative intent, it is not at odds with the purpose affirmed in *American Motors.* The VMDA wanted the Second Paragraph enforced in order to force manufacturers to justify opening a new point of distribution while failing to meet the needs of existing franchisees. This is a species of the ill that is legitimately addressed by the First Paragraph—*i.e.,* the trade practice of fostering destructive

intrabrand competition. To accept Yamaha's argument would require this Court to ignore the Fourth Circuit's unequivocal holding in *American Motors,* a course that is decidedly impermissible.

### 2. The Practical Effects Of The Second Paragraph

In assessing practical effects of challenged legislation, the Court must focus on the probable effect of the statute, without regard to its name or its intended purpose. *See Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 37, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980) (citing *Hughes,* 441 U.S. at 336, 99 S.Ct. 1727 and *Best & Co. v. Maxwell,* 311 U.S. 454, 455–56, 61 S.Ct. 334, 85 L.Ed. 275 (1940)). As the Fourth Circuit has explained, "[t]he obvious focus of the practical effect inquiry is upon the discernable practical effect that a challenged statutory provision has or would have upon interstate commerce as opposed to intrastate commerce." *Waste Management Holdings,* 252 F.3d at 335. A plaintiff satisfies its burden by merely demonstrating the existence of a discriminatory effect apart from the extent of that effect. *See Wyoming,* 502 U.S. at 455, 112 S.Ct. 789 ("volume of commerce affected measures on the *extent* of the discrimination; it is of no relevance to the determination whether a State has discriminated against interstate commerce."); *Limbach,* 486 U.S. at 276–77, 108 S.Ct. 1803 (holding that the size or number of in-state interests favored is irrelevant to analysis of discriminatory effect).

Although, at first blush, the Supreme Court has been seemingly unequivocal in declaring that state laws run afoul of the dormant Commerce Clause when they have the "practical effect" of benefitting in-state economic interests at the expense of out-of-state economic interests,[8] closer

---

8. *See e.g., Oregon Waste Sys.,* 511 U.S. at 99, 114 S.Ct. 1345 ("'[D]iscrimination' simply

means differential treatment of in-state and

analysis reveals that the definition of "discrimination" is not so broad. Rather, only those state laws that discriminate among in-state and out-of-state *competitors* (*i.e.*, entities similarly situated in the chain of commerce) violate the dormant Commerce Clause. *Tracy*, 519 U.S. at 298–300, 117 S.Ct. 811; *see Lewis*, 447 U.S. at 41–42, 100 S.Ct. 2009; *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Hunt v. Washington State Advertising Comm'n*, 432 U.S. 333, 348–53, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 582 n. 16, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997); *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 501–02 (5th Cir.2001); *Maharg v. Van Wert Solid Waste Mgmt. Dist.*, 249 F.3d 544, 553–54 (6th Cir.2001).[9] As the Supreme Court explained in *Tracy*, "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." 519 U.S. at 300, 117 S.Ct. 811.

Yamaha raises a novel discriminatory effects argument here. Although the Second Paragraph directly affects only motorcycle manufacturers (of which where are none in Virginia) and prospective dealers in Virginia, Yamaha notes that, as a consequence of the state-wide protest provision, and the "evolving" regulatory process for resolving such protests, the Second Paragraph confers a benefit on incumbent Virginia dealers at the expense of existing dealers in other states. Specifically, the protest provision gives existing dealers the incentive to file protests, whether meritorious or not, whenever a manufacturer announces its intent to open a franchise anywhere in the Commonwealth, because doing so gives the existing dealer leverage that could be used to extract product-allocation concessions from its manufacturer. Because the supply of motorcycles is limited, argues Yamaha, such concessions necessarily come at the expense of other dealers. And, as a function of Virginia's equitable allocation law,[10] such concessions must come at the expense of other dealers *in other states.* Furthermore, once such a concession is made, the equitable allocation provision dictates that the benefitting Virginia dealers will be entitled to increased product allocation from that point forward. Thus, the Second Paragraph has the "discriminatory effect" of granting added bargaining power to incumbent Virginia dealers to extract greater product allocations over the long term, at the expense of out-of-state dealers.

The evidence supporting Yamaha's product allocation theory is somewhat limited. First, the expert economists for both Yam-

---

out-of-state economic interests that benefits the former and burdens the latter").

**9.** *But see Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (finding a state law that benefitted in-state pulpwood producers at the expense of out-of-state plastic resin producers to be constitutional, in spite of the fact that these entities arguably competed in the market for the materials used to produce milk containers).

**10.** *See* Code of Virginia § 46.2–1993.67(9). The equitable allocation provision makes it unlawful for a motorcycle manufacturer:

> To fail to ship monthly to any dealer, if ordered by the dealer, the number of new motorcycles of each make, series, and model needed by the dealer to receive a percentage of total new motorcycle sales of each make, series, and model equitably related to the total new motorcycle production or importation currently being achieved nationally by each make, series, and model covered under the franchise.

aha and Atlas both testified that the Second Paragraph gave incumbent dealers the economic incentive to file a protest, regardless of merit, whenever a manufacturer proposed to open a new point of distribution in the Commonwealth. Dr. Lutz, Yamaha's expert, testified that, because a dealer protest significantly delays the establishment of the new dealer and imposes other costs and burdens on the manufacturer, existing dealers had an economic incentive to take advantage of the broad rights granted under the Second Paragraph to demand preferential product allocation and other concessions from manufacturers. (2/14/03 Tr. (Lutz) at 196:23–198:13.) Dr. Ileo, Atlas' expert, likewise conceded that, from a purely economic perspective, it would be acceptable for existing dealers to use any legal means available to enhance sales and profitability. (Yamaha Ex. 24 at 63:2–63:18.) Second, Harley–Davidson actually encountered such a demand in connection with the HDM protest, where HDM demanded a 60 percent increase in allocation in exchange for HDM dropping the protest. At first blush, therefore, the product allocation leverage effects that Yamaha has identified seem to be plausible discriminatory effects.

However, Yamaha has produced no evidence indicating that any manufacturer has bowed to such pressure in the face of a protest. Indeed, in the Harley–Davidson case, the only instance where an existing dealer explicitly has used a protest as a means of extracting product, Harley–Davidson has not acceded to the demand, and has indicated that it will never accede to such a demand. (2/14/03 Tr. (Ostrom) at 154:1–154:12, 155:17–155:23.) And, even if a manufacturer were to acquiesce to such blackmail, it is unclear whether, in fact, the result would be a diminution in the product allocation of out-of-state dealers. For example, a manufacturer could satisfy an extortionate request for increased allocation as a means of settling a protest by allocating surplus product resulting from cancelled orders. (2/14/03 Tr. (McNeal) at 53:22–54:20.) Therefore, although the Second Paragraph may create an economically rational basis for existing dealers to file protests of questionable merit, the resolution of which may be lengthy and costly for the manufacturer, as a means of extracting more product, the evidence simply does not support the further, and constitutionally significant conclusion that such extortionate protests have actually resulted in reduced product allocations for out-of-state dealers. In short, the discriminatory effect that Yamaha complains of is speculative, and therefore not an appropriate basis for finding the Second Paragraph discriminatory. *See Arkansas Elec. Co–op. Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 395, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983); *Exxon*, 437 U.S. at 128–29, 98 S.Ct. 2207.

The attenuated and speculative nature of the effect to which Yamaha points is further exacerbated by the lack of evidence respecting whether any out-of-state dealers actually compete in the same market as Virginia dealers. To be sure, a dealer like Atlas in a border area like Bristol, Virginia likely competes against Yamaha-brand dealers in Tennessee at least, and perhaps North Carolina and West Virginia as well. But, the evidence does not reveal the identity of such competitors, let alone whether such competitors have suffered from reduced product allocation as a result of Second Paragraph extortion on the part of an existing Virginia dealer. It would be impermissible to infer such an adverse effect when the record is that the manufacturers have not acceded to extortionate allocation demands and have no intent to do so.

Finally, even if Yamaha had produced some evidence that the Second Paragraph

actually resulted in the discriminatory effects that Yamaha asserts, the Second Paragraph would still survive scrutiny under the discriminatory effects test because the discriminatory effect is a function of Yamaha's business model. The Supreme Court has rejected time and again the "notion that the Commerce Clause protects the particular structure or methods of operation in a market." *Exxon*, 437 U.S. at 127, 98 S.Ct. 2207; *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 93–94, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). An essential facet of Yamaha's discrimination theory is that manufacturers like Yamaha distribute motorcycles to their dealerships through a competitive allocation system. A system of that sort is not an inevitable feature of the motorcycle market, but rather is merely a "method of operation." Under an on-demand allocation system, the effect simply would not exist. Such a system may be inefficient and burdensome on manufacturers, and thereby ultimately harmful to consumers, but those harms relate to the wisdom of the statute, not to its discriminatory effect on commerce. *See Exxon*, 437 U.S. at 128, 98 S.Ct. 2207.

## C. *Pike* Balancing

Having concluded that the Second Paragraph regulates even-handedly and does not discriminate against interstate commerce facially, in its effect or in its purpose, it is necessary next to determine whether the Second Paragraph satisfies the *Pike* balancing test. In *Pike*, the Supreme Court held that:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree.

> And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike*, 397 U.S. at 142, 90 S.Ct. 844 (internal citation omitted). Thus, *Pike* requires the court to consider three elements: "(1) the nature of the local benefits advanced by the statute; (2) the burden placed on interstate commerce by the statute; and (3) whether the burden is 'clearly excessive' when weighed against these local benefits." *Star Scientific, Inc. v. Beales*, 278 F.3d 339, 357 (4th Cir.2002).

### 1. Local Benefits Advanced By The Statute

As noted above, the goal of the Virginia General Assembly in adding the Second Paragraph to the statute was "to afford added protection to motorcycle dealers, above and beyond the relevant market area protection provided by [the First] Paragraph." *Yamaha*, 571 S.E.2d at 127. And, in *American Motors*, the Fourth Circuit held that the General Assembly " 'was empowered to subordinate the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices.' " 592 F.2d at 222 (quoting *Orrin W. Fox Co.*, 439 U.S. at 100–02, 99 S.Ct. 403). However, the fact that the purpose behind the statute is legitimate does not end the local benefits inquiry.

Because *Pike* requires the Court to perform something akin to a cost-benefit analysis, it is necessary also to evaluate the *benefits* arising from the statute. *See Medigen of Kentucky, Inc. v. Public Service Comm'n of West Virginia*, 985 F.2d 164, 166–67 (4th Cir.1993) ("Under *Pike*, we must examine the extent to which the [state law] promotes local interests, and hence benefits the state, while always being conscious of the degree to which those

local interests could be served by other means."). Therefore, the mere fact that Virginia regulated with legitimate purpose means little in this aspect of the analysis. The focus of the inquiry here is on the *benefits* that the statute seeks to effect.

■ Although the parties agree that the "benefits" of the statute, rather than the mere purpose, are the focus of the inquiry, they disagree as to the degree of deference that the Court should give to the state legislature, and whether the party defending the legislation need introduce any evidence respecting actual benefits. Atlas argues that no such evidence is necessary because courts are supposed to defer to the judgments of state legislatures in this context. Under Atlas's reasoning, the mere fact that the legislature has acted in pursuit of a legitimate end gives rise to the presumption that its means actually accomplish that end. Yamaha, in contrast, argues that such deference is not warranted in this context, and, to the contrary, that the Court must independently determine whether the Second Paragraph actually promotes the putative interests identified by the Commonwealth.

The decisions of the Supreme Court suggest that the inquiry into putative benefits is actually a combination of the two approaches that the parties advance here, and that it is somewhat akin to rational basis review in the equal protection context. The Court is to analyze the evidence available to the legislature at the time it enacted the legislation in question, and determine whether the means chosen are rationally related to legislature's legitimate ends. If the legislation satisfies this test, the Court is to presume that the legislation actually achieves the "local benefits" sought. *See CTS Corp.*, 481 U.S. at 91–92, 107 S.Ct. 1637 (citing *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 679, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Brennan, J., concurring)).

The language the Court used in *Pike* provides the first clue as to the appropriate level of deference. In *Pike*, the Court explained that courts are to consider the "putative" local benefits of the challenged legislation. *See* 397 U.S. at 142, 90 S.Ct. 844. Webster's Third New International Dictionary defined "putative" as "commonly accepted or supposed" or "assumed to exist or to have existed." The use of the modifier putative thus suggests some level of deference: courts are to look at the benefits "assumed to exist or to have existed," or the benefits "commonly accepted or supposed."

Consistent with the language of *Pike*, the Supreme Court, when assessing local benefits under the *Pike* test, has assumed that challenged legislation achieves the benefits sought. In *Pike* itself, the Court ultimately found that the law in question—a requirement that Arizona cantaloupe growers package their cantaloupes in a certain way—violated the dormant Commerce Clause; but, in doing so, the Court assumed that the legislation achieved its putative end—*i.e.*, the protection and enhancement of the reputation of growers within the state—even if that end was somewhat "tenuous." *See* 397 U.S. at 145, 90 S.Ct. 844. Similarly, in *CTS Corp.*, 481 U.S. at 91–92, 107 S.Ct. 1637, where the Court considered a challenge to an Illinois law regulating corporate takeovers, the Court noted that Illinois had a legitimate interest in regulating tender offers, and then assumed that the statute achieved the ends sought. "We are not inclined 'to second-guess the empirical judgments of lawmakers concerning the utility of legislation.'" *Id.* at 92, 107 S.Ct. 1637 (quoting *Kassel*, 450 U.S. at 679, 101 S.Ct. 1309 (Brennan, J., concurring)).

Although deferential, the standard is not satisfied by mere recitation of a legitimate purpose. Rather, the means the state employs must bear some rational basis to the

ends sought. Justice Brennan explained the nature of inquiry in his concurrence in *Kassel:*

> In determining those benefits, a court should focus ultimately on the regulatory purposes identified by the lawmakers and on the evidence before or available to them that might have supported their judgment. Since the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation, the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes. It is not the function of the court to decide whether *in fact* the regulation promotes its intended purpose, so long as an examination of the evidence before or available to the lawmaker indicates that the regulation is not wholly irrational in light of its purposes.

450 U.S. at 680–81, 101 S.Ct. 1309 (emphasis in original) (citations omitted).[11] Although not an opinion of the majority at the time, the Supreme Court and lower courts have come to endorse this approach. *See CTS Corp.,* 481 U.S. at 92, 107 S.Ct. 1637; *Ford Motor Co.,* 264 F.3d at 503–04.[12]

**11.** Because Yamaha hotly contests the significance of Justice Brennan's concurrence in *Kassel,* (Yam. Supplemental Pre–Hearing Brief, docket # 69, at 8 n. 1.), a brief statement about *Kassel* is necessary here.

In *Kassel,* a majority of the Court held that an Iowa law that prohibited the use of 65–foot double trailer trucks on its highways was offensive to the dormant Commerce Clause under the *Pike* test. Four justices held that the burdens on interstate commerce clearly exceeded the putative local benefit of increasing highway safety—a *post hoc* rationale—after a lengthy review of the efficacy of the law in promoting safety. Justice Brennan, joined by Justice Marshall, agreed that the law violated the dormant Commerce Clause, but found that the Court's consideration of the regulation's efficacy as a safety regulation was both unwarranted and unnecessary. Under Justice Brennan's approach, *post hoc* statements of purpose are not cognizable in the local benefits inquiry. Rather, only the purpose actually motivating the legislature is cognizable. Because Justice Brennan believed that the evidence conclusively proved that the state's purpose was protectionist—*i.e.,* an effort to insulate it from a nationwide problem (increasing interstate truck traffic)—he would have found the statute unconstitutional under the *per se* test.

Yamaha asserts that, because Justice Brennan conducted a penetrating view of the state's purpose, Justice Brennan does not actually advocate deference respecting local benefits, his averments notwithstanding. This argument conflates two distinct inquiries—the inquiry into purpose, and the assessment of benefits—and is therefore misplaced.

**12.** Indeed, this approach is consistent with the Supreme Court's opinion in *Minnesota v. Clover Leaf Creamery Co.* decided earlier that same term. 449 U.S. at 473, 101 S.Ct. 715. In *Clover Leaf Creamery,* the Court considered whether Minnesota's cardboard container requirement violated the Equal Protection Clause, as well as whether it violated the dormant Commerce Clause. In conducting rational basis review under the Equal Protection Clause, the Court explained that Courts must be deferential in assessing whether the enactment is rationally related to a legitimate state end: "States are not required to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Id.* at 464, 101 S.Ct. 715 (internal quotation marks omitted). The Court then found the question of whether the enactment achieved its putative ends to be debatable, at the very least, and found rational basis review to be satisfied. *Id.* Later in its opinion, when conducting the *Pike* balancing test, the Court, without any discussion, referenced the benefits accepted as true under rational basis review, and concluded that the burdens created by the statute did not "clearly exceed" those benefits. *Id.* at 473–74, 101 S.Ct. 715. Thus, the assessment of local benefits under the dormant Commerce Clause requires rational basis means-ends review, and, if the law satisfies that review, the assumption is that the provision achieves those ends.

The Fourth Circuit has demonstrated that this rational basis review has some bite. In *Medigen,* the Court of Appeals considered a West Virginia law requiring that all interstate transporters of medical waste obtain a certificate of convenience and necessity in order to operate within the state. *See* 985 F.2d at 165. The state argued that the benefits of the statute were (1) the prevention of insufficient statewide service, a result they believed would obtain were market entry unregulated, and (2) the prevention of ruinous competition. *Id.* The Fourth Circuit directly questioned the judgment of the West Virginia legislature as to the both of these putative benefits. Respecting the first, the Court noted that "West Virginia's goal of providing universal service at reasonable rates may well be a legitimate state purpose, but restricting market entry does not serve that purpose." *Id.* at 167. Respecting the second justification, the Court found "no basis in the record . . . for concluding that competition in this market has had or will have any destructive effects. Because the 'ruinous' effects of competition are entirely speculative, their prevention cannot justify restricting market entry." *Id.* at 167. Thus, although not so acknowledging in the opinion, the Fourth Circuit employed the very test that Justice Brennan laid out in his *Kassel* concurrence. Consonant with that approach, the Court of Appeals concluded that the proffered purposes were legitimate, then reviewed the evidence available to the legislature to assess whether the means employed bore a rational relationship to the ends sought, and found that a rational basis was lacking.

Here, as noted above, the General Assembly's legitimate purpose in amending § 46.2–1993.67(5) was to give motorcycle dealers added protection beyond that provided by the First Paragraph, and evidence available to the General Assembly at the time of passage indicates that the Sec-ond Paragraph bears a rational relationship to that end. Having found a rational basis for the provision, the benefits sought to be achieved must be assumed.

Because the *Pike* test requires a comparison of these benefits against the burdens on interstate commerce, some quantification of these benefits is also necessary. This task is difficult at the very least, and is impossible to accomplish with any precision. The purpose of the statute, as described in *American Motors* is to protect the investment expectations of existing dealers. For example, the record here reflects that Atlas recently completed a 4000 square foot expansion of its dealership facility at a cost of over $345,000. (Joint App. Ex. 9 at ¶¶ 3,5.) That expansion was undertaken with the expectation by Atlas that it would need the extra space to serve the growing demand in what Atlas believed to be its exclusive geographic market for the foreseeable future. (*Id.*) With the opening of a dealership in Rosedale, Atlas's return on its investment in expanded capacity would be diminished measurably. The prevention of this diminution in return caused by the proliferation of dealerships is the identifiable benefit of the statute. Unfortunately, it is impossible to quantify the benefit any further because the diminution in return depends upon variables such as the proposed location and sales capacity of a new dealer and the existing capacity of affected dealers. Therefore, the closest approximation of the benefit achieved by the statute is that some number of existing dealers, who, although located beyond the relevant market area defined by the First Paragraph, serve the geographic market area of a hypothetical prospective dealer in a not insignificant way, will be protected against the diminution in return on their investment in capacity and advertising that would occur should the hypothetical dealer actually open.

## 2. Burdens On Interstate Commerce

Yamaha identifies three broad categories of economic effects that constitute burdens on interstate commerce: (1) the chilling effect on the establishment of new dealerships; (2) the restriction on the flow of new motorcycles into Virginia; and (3) the harm to Virginia consumers. While Yamaha may be correct in noting that the Second Paragraph creates some of these burdens, none of these effects are cognizable as burdens on interstate commerce in the *Pike* analysis.

As a preliminary matter, it is necessary to emphasize that the burdens on interstate commerce contemplated by the *Pike* test are different from the "discriminatory effects" considered in connection with the *per se* test. That is, if a state law "discriminates" against out-of-state actors in its practical effect, the enactment is *per se* unconstitutional, and the *Pike* test need not be performed. Unfortunately, courts at all levels of the federal judiciary have not been careful in applying this distinction, and thus have blurred the line between the *per se* test and the *Pike* test by purporting to apply the *Pike* test, when in fact the "burdens on interstate commerce" were discriminatory effects. *See Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 505 (7th Cir.1989); *see generally* Donald H. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L.Rev. 1091 (1986). In *Tracy*, 519 U.S. at 299 n. 12, 117 S.Ct. 811, the Supreme Court itself recognized this analytical dissonance in its own decisions:

> [S]everal cases that have purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations, *see, e.g., Pike* [, 397 U.S.] at 145, 90 S.Ct. 844 (declaring packing order "virtually *per se* illegal" because it required business operation to be performed in-state); *Kassel* [,] 450 U.S. [at] 677, 101 S.Ct. 1309 (plurality opinion of Powell, J.) (noting that in adopting invalidated truck-length regulation the State "seems to have hoped to limit the use of its highways by deflecting some through traffic"); *id.*, at 679–687, 101 S.Ct. 1309 (Brennan, J., concurring in judgment) (emphasizing that truck-length regulation should be invalidated solely in view of its protectionist purpose)[.]

The independent utility of the *Pike* test, therefore, is limited to those occasions where the regulation in question is non-discriminatory, but nonetheless burdens interstate commerce in a manner that is clearly excessive when compared to the putative local benefits.

The class of burdens that are properly cognizable under the *Pike* test are quite limited. The Supreme Court has been emphatic that the dormant Commerce Clause does not incorporate any specific economic theory and that statutes that may harm consumers under one economic view are not necessarily unconstitutional as a result. In *Exxon*, the Court explained that:

> the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations. It may be true that the consuming public will be injured by [a probable effect of the regulation], but again that argument relates to the wisdom of the statute, not to its burden on commerce.

437 U.S. at 127–28, 98 S.Ct. 2207. Although the Supreme Court has employed some contrary language in a case where it applied the *Pike* test after finding a state law unconstitutional under the *per se* test,[13] several justices, in the Court's more recent cases, have emphasized that the

---

**13.** *See Edgar v. MITE Corp.*, 457 U.S. 624, 643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)

(citing as a burden on interstate commerce

view expressed in *Exxon* is the correct one. *See C & A Carbone*, 511 U.S. at 424–25, 114 S.Ct. 1677 (Souter, J., concurring)[14]; *CTS Corp.*, 481 U.S. at 95–96, 107 S.Ct. 1637 (Scalia, J., concurring).

Once economic efficacy is removed from consideration as a burden on interstate commerce under *Pike*, only a narrow class of burdens remain. In *Tracy*, the Supreme Court explained just how narrow this class of cases is. *See* 519 U.S. at 299 n. 12, 117 S.Ct. 811 After noting that conflation of the *per se* and *Pike* tests in some of its own opinions, the Court explained that the only cases where the Court has struck down a "genuinely nondiscriminatory" law have been those cases where the law in question "undermined a compelling need for national uniformity in regulation." *Id.* (citing *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (conflict in state laws governing truck mud flaps); *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) (train lengths); and *CTS Corp.*, 481 U.S. at 88, 107 S.Ct. 1637 ("This Court's recent Commerce Clause cases also have invalidated statutes that may adversely affect interstate commerce by subjecting activities to inconsistent regulations.")). Thus, only in those cases where the state has regulated in an area for which there is a "compelling

need" for national uniformity will a state law create the type of burden that will violate the *Pike* test.

The limitation on the burdens that are cognizable under the *Pike* test is highly significant in this case because the Second Paragraph does create significant economic burdens chilling the opening of new dealerships and thereby, at least in theory, harms consumers by depriving them of the price benefits of rigorous intrabrand and interbrand competition. These effects, however, all relate to the economic efficacy of the Second Paragraph, and thus are not the type of burdens the *Pike* test is meant to address. Importantly, Yamaha has not demonstrated that the Second Paragraph regulates in an area where there is a "compelling need" for national uniformity. Therefore, the Second Paragraph creates no cognizable burdens on interstate commerce, and thus necessarily survives the *Pike* inquiry.

And, even if the deleterious effects of reduced intraband and interband competition were cognizable, Yamaha has produced no evidence showing that prices for motorcycles, in fact, have increased as a result of the Second Paragraph. At most, Yamaha has shown a reduction in competition, but without some evidence quantifying the price effect of that reduction, it is

under the *Pike* test the fact that the statute hindered "[t]he reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition"), *see also Central GMC, Inc. v. General Motors Corp.*, 946 F.2d 327, 334 (4th Cir. 1991) (citing *Edgar* and stating that "[t]he restrictions implicit in the commerce clause are designed ... to prohibit states from hindering the 'reallocation of economic resources to their highest valued use, a process which can improve efficiency and competition' ").

**14.** In his concurrence in *C & A Carbone*, Justice Souter explained:

No more than the Fourteenth Amendment, the Commerce Clause "does not enact Mr. Herbert Spencer's Social Statics ... [or] embody a particular economic theory, whether of paternalism ... or of *laissez faire*." *Lochner v. New York*, 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting). The dormant Commerce Clause does not "protec[t] the particular structure or methods of operation in a[ny] ... market." *Exxon*, 437 U.S. at 127, 98 S.Ct. 2207. The only right to compete that it protects is the right to compete on terms independent of one's location. 511 U.S. at 424–25, 114 S.Ct. 1677 (alterations in original).

impossible to conclude that this burden clearly exceeds the putative local benefit.

## CONCLUSION

For the foregoing reasons, the second paragraph of Code of Virginia § 46.2–1993.67(5) does not violate the dormant Commerce Clause. Accordingly, judgment shall enter in favor of the Defendants.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.