**YAMAHA MOTOR CORPORATION, U.S.A., Plaintiff–Appellant,**

**v.**

**JIM'S MOTORCYCLE, INCORPORATED, d/b/a Atlas Honda/Yamaha; Demerst B. Smit, in his official capacity as the Commissioner of the Department of Motor Vehicles, Defendants–Appellees.**

**Harley–Davidson Motor Company, Amicus Supporting Appellant.**

No. 03–2070.

United States Court of Appeals, Fourth Circuit.

Argued: May 4, 2004.

Decided: March 18, 2005.

the guidelines, the district court should adjust its calculation accordingly.

**ARGUED:** David Paul Murray, Willkie, Farr & Gallagher, Washington, D.C., for

Appellant. Maureen Riley Matsen, Deputy State Solicitor, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellees. **ON BRIEF:** Robert M. Tyler, McGuirewoods, L.L.P., Richmond, Virginia, for Appellant. Jerry W. Kilgore, Attorney General of Virginia, William H. Hurd, State Solicitor, William E. Thro, Deputy State Solicitor, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellee Smit; Walter A. Marston, Reed Smith, L.L.P., Richmond, Virginia; George E. Kostel, Reed Smith, L.L.P., Falls Church, Virginia, for Appellee Jim's Motorcycle, Inc. Nicholas T. Christakos, James J. Briody, Sutherland, Asbill & Brennan, L.L.P., Washington, D.C., for Amicus Curiae.

Before LUTTIG and MICHAEL, Circuit Judges, and Bobby R. BALDOCK, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

Reversed and remanded by published opinion. Judge MICHAEL wrote the opinion, in which Judge LUTTIG and Senior Judge BALDOCK joined.

MICHAEL, Circuit Judge:

This case involves a dormant Commerce Clause challenge to a unique provision in Virginia's motorcycle dealer franchise law. The provision allows any existing franchised dealer in Virginia to protest the establishment of a new dealership for the same brand anywhere in the Commonwealth. The district court rejected the challenge, concluding that the statute neither discriminates against, nor imposes a cognizable burden upon, interstate commerce. We conclude, however, that the statute's provision for statewide protest rights unduly burdens interstate commerce in violation of the dormant Commerce Clause. The judgment is therefore reversed.

I.

A.

Virginia provides economic protection for its existing motorcycle dealers by restricting the ability of manufacturers (or distributors) to open new dealerships. The dealers have enjoyed this economic protection for many years under the First Paragraph of Virginia Code § 46.2–1993.67(5), or its predecessor, which gives an existing motorcycle dealer the right to protest the establishment of a new dealership for the same line-make (brand) in its "relevant market area," defined as a seven to ten-, fifteen-, or twenty-mile radius around the existing dealer, depending on population density. Va.Code Ann. § 46.2–1993. When a protest is filed under the First Paragraph, the proposed dealership may open only if there is reasonable evidence that the market can support all of the dealers in the line-make in the relevant market area. *Id.* § 46.2–1993.67(5). The First Paragraph closely tracks the language of Virginia's motor vehicle franchise statute that we upheld against a dormant Commerce Clause challenge in *American Motors Sales Corp. v. Division of Motor Vehicles,* 592 F.2d 219 (4th Cir.1979).

This case, however, involves a challenge to the Second Paragraph of Virginia Code § 46.2–1993.67(5), which was enacted in 1997. The Second Paragraph provides that:

No new or additional motorcycle dealer franchise shall be established in any county, city or town unless the manufacturer [or] distributor ... gives advance notice to any existing franchised dealers of the same line-make. The notice shall be in writing and sent ... at least forty-

five days prior to the establishment of the new or additional franchise. *Any existing franchise dealer* may file a protest within thirty days of the date the notice is received. The burden of proof in establishing inadequate representation of such line-make motorcycles shall be on the manufacturer [or] distributor. . . .

*Id.* (emphasis added).

The Second Paragraph differs from the First by expanding the scope of existing dealers' protest rights beyond a relevant market area. No statement of purpose accompanies the Second Paragraph, and the Virginia General Assembly does not keep legislative history. There is no doubt, however, that the provision aims to expand protection for motorcycle dealerships. *See Yamaha Motor Corp. v. Quillian*, 264 Va. 656, 571 S.E.2d 122, 125 (2002). The Commonwealth suggests that the added protection was needed because, in contrast to automobile dealerships, which make roughly ninety-five percent of their sales within a twenty-mile radius, motorcycle dealerships, which are fewer in number, typically sell within a forty-mile radius. Moreover, the Second Paragraph was enacted at a time of record motorcycle sales nationwide. Many dealerships were complaining to manufacturers that they were not sufficiently supplied with the top-selling models, and there is some evidence that the Second Paragraph also aims to avert any reduction in product allocation for existing motorcycle dealerships.

### B.

In October 2000 Yamaha, a motorcycle distributor, sought to authorize a new dealership in Rosedale, Virginia, roughly twenty-six miles from Jim's Motorcycle, Inc., d/b/a Atlas Honda/Yamaha (Atlas), a franchised Yamaha dealer in Bristol, Virginia. Yamaha's nationwide sales had increased in each of the preceding three years, prompting it to seek additional dealers. The proposed dealership in Rosedale, Mountain Suzuki, was six miles outside Atlas's relevant market area as defined by the First Paragraph. Because the First Paragraph offered it no protection, Atlas filed a Second Paragraph protest with the Commissioner of the Virginia Department of Motor Vehicles (DMV), the state official responsible for administering the statute. The Commissioner used the Atlas protest to issue a decision, dated August 6, 2001, interpreting the Second Paragraph and establishing procedures for resolving protests filed under that provision. The Commissioner first ruled that when an existing dealer files a protest, a formal evidentiary hearing will be held if the dealer makes a preliminary showing in an informal fact-finding proceeding that it represents "in a not insignificant or insubstantial way" the line-make of motorcycle in the county, city, or town where the new dealer would be located. J.A. 41–46; Va.Code Ann. § 46.2–1993.67(5). The Commissioner did not define "in a not insignificant or insubstantial way" in terms of a fixed number of sales or percentage of market share, but referred to it as not "de minimus [sic] or incidental or accidental." J.A. 47. In determining whether the manufacturer has met its ultimate burden of proving inadequate representation of its line-make, the Commissioner would focus only on the market in the county, city, or town in which the proposed new dealership would be located. The Commissioner also did not define "inadequate representation," but he said that "part of the concept" was "market penetration," that is, the extent to which a product is recognized and bought by customers in a particular market. J.A. 49. Finally, the Commissioner took the Second Paragraph literally and accepted that the statement "[a]ny existing franchise dealer may file a protest" means that

any existing Virginia motorcycle dealer may protest the establishment of a new dealership in the same line-make anywhere in the Commonwealth.

As for the Atlas protest itself, the Commissioner ruled that Atlas was entitled to a formal evidentiary hearing. Atlas had sold fourteen Yamaha motorcycles in the four years from 1997 through 2000. Ten of the fourteen sales occurred in a single year; Atlas sold either one or two Yamaha motorcycles in each of the remaining three years. Though the irregularity of these sales might suggest they were incidental, the fourteen sales over four years represented fifty-eight percent of all Yamaha brand sales in Russell County, Virginia. Accordingly, the Commissioner concluded that Atlas represented a "not insubstantial" number of Yamaha bike sales in the Russell County market. J.A. 46–47.

In May 2002 Harley–Davidson Motor Company, Inc., amicus curiae in this case, notified Virginia dealers of its intent to authorize a new dealership in Prince George County, Virginia. H.D. Motorcycles Sales & Service, Inc. (HDM), a Richmond Harley–Davidson dealer, filed a protest under both the First and Second Paragraphs. The new dealership was outside HDM's relevant market area, a circumstance that disposed of the First Paragraph protest. In informal fact-finding proceedings before the Commissioner, evidence was offered that HDM's share of the motorcycle market in Prince George County was 14.9 to 16.7 percent for the years 1999 through 2001. This led the Commissioner to determine that HDM represented the Harley–Davidson line-make in the county in a not insubstantial way. The Commissioner thus concluded that HDM was entitled to a formal evidentiary hearing on the issue of inadequate representation.

## C.

In the meantime, on July 25, 2001, Yamaha sued the Commissioner and Atlas in federal court seeking a declaration that the Second Paragraph violates the dormant Commerce Clause of the Constitution and an injunction prohibiting the paragraph's enforcement. The parties stipulated to certain facts, and the district court conducted a one-day bench trial in April 2002. In considering the case, the district court recognized that no Virginia court had interpreted the Second Paragraph. Accordingly, before issuing a decision, the district court certified four questions to the Supreme Court of Virginia that dealt with the scope of an existing dealer's protest rights.

The Supreme Court of Virginia confirmed in large part the Commissioner's interpretation of the Second Paragraph. *Quillian*, 264 Va. 656, 571 S.E.2d 122. The court made clear that the Second Paragraph grants "any existing franchised dealer" in Virginia the right to protest whenever a manufacturer seeks to authorize a new dealership *anywhere in the Commonwealth* that would sell the same line-make as the existing dealer. *Id.* at 127. The Virginia court further explained that once a protest moves to a formal evidentiary hearing, the manufacturer must prove "inadequate representation . . . in the market area likely to be served by the new dealer." *Id.* at 126–28 (emphasis omitted). Thus, the state court rejected the Commissioner's interpretation that proof of inadequate representation should be limited to the same county, city, or town in which the proposed dealer would be located. *Id.* The Commissioner adjusted his standards accordingly.

After the Supreme Court of Virginia issued its decision, Yamaha's dormant Commerce Clause challenge resumed in the district court. The parties conducted

further discovery, and thereafter the court held two additional days of trial. On July 31, 2003, the court issued a commendably thorough decision that included extensive findings of fact and conclusions of law. The court first determined that the Second Paragraph did not discriminate against interstate commerce. The district court then found that the Second Paragraph imposed severe burdens on interstate commerce, although it ultimately concluded that these burdens were not cognizable under the dormant Commerce Clause. We will recount a few of the findings here, reserving others for later.

The district court found that "even a frivolous protest to which the Commissioner responds with uncharacteristic dispatch *could take years to resolve*" because a protesting dealer who is denied a hearing may appeal to a Virginia circuit court and then to the Virginia Court of Appeals. *Yamaha Motor Corp. v. Smit,* 276 F.Supp.2d 490, 501 (E.D.Va.2003) (emphasis added). And because the Commissioner himself has frequently failed to abide by the statutory timetable for resolving First Paragraph protests, his "promise to resolve Second Paragraph protests in a timely manner rings rather hollow." *Id.* The district court also found that in addition to being lengthy, the protest process is unpredictable: the standards for granting a protest are "highly subjective" and "remarkably vague" because the Commissioner has resisted defining what "not insubstantial representation" means. *Id.* (internal quotation marks omitted). Instead, the Commissioner has opted to grant a hearing whenever an existing dealer produces *some* evidence of nonincidental representation. *Id.* As a result, the district court found that

> a manufacturer cannot predict with any certainty whether any of the potential protests ... will actually advance to the formal evidentiary hearing phase, and

must assume that, given the lack of a clearly defined standard and the Commissioner's bias in favor of granting the hearing, that it will be subjected to the full administrative process, the result of which can be contested in subsequent judicial proceedings.

*Id.* (internal citation omitted). The court also found that protests were "virtually certain" to occur in response to any proposal for a new dealership. *Id.* at 502. Expert economists testified that, given the tight supply of top-selling motorcycles, "an existing dealer has the economic incentive to file a protest of questionable merit in order to gain bargaining leverage" with manufacturers. *Id.* In addition, the district court described a ripple effect from the Second Paragraph that will thwart the establishment of new dealerships in Virginia. It is likely, the court found, that prospective dealers will not be able to secure the financing to acquire new franchise locations because manufacturers will be reluctant to provide the necessary commitment letters when protests are virtually certain. *Id.* Finally, the court recognized that the economic realities produced by the Second Paragraph had led Yamaha and Harley–Davidson "to forego establishing new dealers in Virginia." *Id.* This has caused "a relative reduction in intrabrand and interbrand competition." *Id.* at 503. As the court noted, this should "[a]s a matter of economic theory ... lead to higher prices for consumers," but there is no evidence yet of such an effect. *Id.*

Despite its finding that the "Second Paragraph, and the procedures that the Commissioner has adopted to enforce it, create a significant hurdle for manufacturers and their prospective new dealers," *id.* at 500, the district court determined that the burdens imposed by the Second Paragraph do not violate the dormant Commerce Clause because the statute does not

"regulate[ ] in an area where there is a 'compelling need' for national uniformity," *id.* at 514. The court therefore granted judgment for the defendants, and Yamaha appeals. We review the district court's factual findings for clear error and its legal interpretation of the Commerce Clause de novo. *Williams v. Sandman,* 187 F.3d 379, 381 (4th Cir.1999).

## II.

■ The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although the Clause speaks only of congressional power, the Supreme Court since 1852 "has construed the Commerce Clause as incorporating an implicit restraint on state power even in the absence of congressional action—hence the notion of a 'dormant' Commerce Clause." 1 Laurence H. Tribe, American Constitutional Law § 6–2, at 1030 (3d ed.2000) (citing *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 318, 13 L.Ed. 996 (1851)). The dormant Commerce Clause thus "limits the power of the States to erect barriers against interstate trade." *Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (internal quotation marks omitted).

■ Analysis of a dormant Commerce Clause challenge to a state statute proceeds on two tiers, a discrimination tier and an undue burden tier. *See Envtl. Tech. Council v. Sierra Club,* 98 F.3d 774, 785 (4th Cir.1996). Under the discrimination tier, "[w]hen a state statute clearly discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. Indeed, when the state statute amounts to simple economic protectionism, a virtually *per se* rule of invalidity has applied." *Wyoming v. Oklahoma,* 502 U.S. 437, 454–55, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (internal quotation marks and citations omitted). Under the undue burden (or *Pike* balancing) tier,"[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). A "less strict scrutiny" applies under the undue burden tier. *Wyoming,* 502 U.S. at 455 n. 12, 112 S.Ct. 789. As the Supreme Court has recognized, "there is no clear line separating close cases on which scrutiny [or tier of analysis] should apply." *Id.* (internal quotation marks omitted). Here, the district court rejected Yamaha's dormant Commerce Clause challenge after applying both tiers of analysis. The Court held that the Second Paragraph of Virginia Code § 46.2-1993.67(5) neither discriminates against nor imposes any cognizable burdens on interstate commerce. Yamaha argues that the court erred in each of these determinations.

### A.

■ A "state law [that] discriminates [against interstate commerce] facially, in its practical effect, or in its purpose," *Envtl. Tech. Council,* 98 F.3d at 785, will be struck down unless the state demonstrates "both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means," *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (internal quotation marks omitted). The district court found that the Second Paragraph does not discriminate against interstate commerce,

and thus took the discrimination-tier analysis no further.

■ The district court concluded, and Yamaha does not dispute, that the language of the Second Paragraph is neutral on its face. The provision regulates motorcycle manufacturers, and it makes no distinction between in-state and out-of-state manufacturers. There are no motorcycle manufacturers in Virginia, but if there were, the statute would "visit[ ] its effects equally upon both interstate and local business." *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). Further, as we discuss in greater detail in our *Pike* analysis, *see infra* part II.B, the Second Paragraph has a legitimate general purpose: to protect existing motorcycle dealers in Virginia from unfair practices by manufacturers (regardless of their location) in the establishment of new dealerships. We therefore turn to the district court's determination that the Second Paragraph does not discriminate in its practical effect.

■ In addressing the issue of discriminatory effect, the district court properly focused on the "probable effect[ ]," *Lewis*, 447 U.S. at 37, 100 S.Ct. 2009, or the "discernable practical effect that [the] challenged statutory provision has or would have upon interstate commerce," *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 335 (4th Cir.2001). Yamaha argues that the Second Paragraph discriminates in effect by conferring a benefit on existing motorcycle dealers in Virginia at the expense of existing dealers in other states. Yamaha and other motorcycle manufacturers distribute their bikes to dealers based on a national allocation system, under which dealers receive bike allotments based on their prior sales and on national availability. As the district court found, the demand for motorcycles has long exceeded supply, and dealers are constantly in need of top-selling models. Virginia dealers therefore have an incentive to file Second Paragraph protests as a means of gaining leverage to negotiate with manufacturers for more favorable product allocations. Any product allocation concessions would come at the expense of other dealers, Yamaha argues. And because Virginia has an equitable allocation law, *see* Va.Code Ann. § 46.2–1993.67(9), any concessions would come at the expense of dealers in other states. Thus, the Second Paragraph has a discriminatory effect, Yamaha claims, by giving added bargaining power to Virginia dealers, which they might leverage to extract more favorable product allocations to the detriment of out-of-state dealers. The district court held that Yamaha's theory was too speculative to provide a basis for finding the Second Paragraph discriminatory in its effect. *Yamaha*, 276 F.Supp.2d at 508.

As the district court's discussion reveals, Yamaha did not produce any evidence indicating that the Second Paragraph's probable effect would be that a manufacturer would yield to a protesting dealer's effort to extract additional motorcycles or some other advantage in exchange for dropping a protest. The court pointed to the one (failed) attempt by a Virginia dealer to use a protest to gain additional product. HDM filed a Second Paragraph protest to Harley–Davidson's proposed establishment of a new dealership; thereafter HDM offered to drop its protest in exchange for a sixty percent increase in bike allocation and the conversion of a secondary retail location into a full dealership. In rebuffing HDM, Harley–Davidson indicated that it would never give in to such demands. Thus, the district court found that "the manufacturers have not acceded to extortionate allocation demands and have no intent to do so." *Id.* This finding is supported by the record, and the district court

was correct in concluding that Yamaha did not produce any evidence that the Second Paragraph would have any probable or discernible discriminatory effects on interstate commerce. Accordingly, we will not disturb the district court's conclusion that the Second Paragraph does not discriminate against interstate commerce.

## B.

■ Yamaha next argues that the district court erred when it determined that the Second Paragraph "survives the *Pike* inquiry" because it "creates no cognizable burdens on interstate commerce." *Id.* at 514. A statute that does not discriminate against interstate commerce may still be struck down under *Pike* balancing if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree." *Pike,* 397 U.S. at 142, 90 S.Ct. 844 (internal citation omitted); *see also General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (stating that the dormant Commerce Clause also prohibits regulation that "unduly burdens interstate commerce"). A statute need not be perfectly tailored to survive *Pike* balancing, but it must be reasonably tailored: "the extent of the burden that will be tolerated ... depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. 844.

■ In determining whether a statute has "a legitimate local purpose" and "putative local benefits," a court must proceed with deference to the state legislature. *See CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 92, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). Courts "are not inclined to second-guess the empirical judgments of

lawmakers concerning the utility of legislation." *Id.* (internal quotation marks omitted). Thus, we consider whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute. *See id.* at 92–93, 107 S.Ct. 1637. We likewise apply a deferential standard in identifying a statute's putative benefits. *See id.*

■ The *Pike* test requires closer examination, however, when a court assesses a statute's burdens, especially when the burdens fall predominantly on out-of-state interests. *See id.* at 93, 107 S.Ct. 1637; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 473 n. 17, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Telvest, Inc. v. Bradshaw,* 697 F.2d 576, 580 (4th Cir.1983). Nevertheless, when local economic interests are affected, "[n]ondiscriminatory measures ... are generally upheld, in spite of [some burden] on interstate commerce, in part because the existence of major in-state interests adversely affected is a powerful safeguard against legislative abuse." *W. Lynn Creamery, Inc. v. Healy,* 512 U.S. 186, 200, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (internal quotation marks and alterations in original omitted). In other words, burdened in-state interests can be relied upon to prevent or rectify legislative abuse, but the same cannot be said of burdened out-of-state interests. Thus, when there are few or no adversely affected in-state interests, *Pike* balancing serves as a check against legislative abuse. *See Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 444 n. 18, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978) (upholding state highway regulations because they adversely affect "local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations").

In this case, the first part of the *Pike* analysis—determining whether the Second Paragraph serves a legitimate local purpose—is controlled by *New Motor Vehicle Board v. Orrin W. Fox Co.*, 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978), and *American Motors*, 592 F.2d 219. In *Orrin Fox* the Supreme Court upheld an automobile dealer franchise regulation challenged under the Due Process Clause and the Sherman Act, finding that it served the legitimate purpose of addressing the "disparity in bargaining power between automobile manufacturers and their dealers" by providing protections for existing dealers (often small businesses) when new dealer franchises were proposed. 439 U.S. at 100, 107. Shortly thereafter, in *American Motors* we upheld a predecessor to the First Paragraph that made it unlawful for a motor vehicle manufacturer "[t]o grant an additional franchise for a particular line-make ... in a trade area already served by [its] dealer or dealers ... unless the franchisor" gave written notice to its other dealers "in the trade area;" a notified dealer could then request a determination by the Commissioner as to whether the trade area would support another dealer. Va.Code Ann. § 46.1–547(d) (1978); *Am. Motors*, 592 F.2d at 221. In evaluating the statute's purpose, we followed *Orrin Fox* and determined that the Virginia General Assembly was legitimately " 'empowered to subordinate the franchise rights of ... manufacturers to the conflicting rights of their franchisees where necessary to prevent unfair or oppressive trade practices.' " *Id.* at 222 (quoting *Orrin Fox*, 439 U.S. at 107, 99 S.Ct. 403). The purpose of the Second Paragraph is basically the same as that of the predecessor to the First Paragraph we upheld in *American Motors*. The Second Paragraph seeks to achieve that purpose by more aggressive means, but this difference affects the balancing of interests, not the legitimacy of the statute's purpose. Thus, we proceed to an assessment of the Second Paragraph's benefits and burdens under *Pike* balancing.

The district court struggled to articulate a benefit of the Second Paragraph, stating that

> the closest approximation of the benefit achieved by the statute is that some number of existing dealers, who, although located beyond the relevant market area defined by the First Paragraph, serve the geographic market area of a hypothetical prospective dealer in a not insignificant way, will be protected against the diminution in return on their investment in capacity and advertising that would occur should the hypothetical dealer actually open.

*Yamaha*, 276 F.Supp.2d at 512. The Commonwealth maintains that such "objective precision in identifying benefits, beyond those presumed by the purpose of the statute ... is not necessary." Br. for Appellees at 38–39. Accordingly, the Commonwealth offers no new argument for the benefits of the Second Paragraph. Instead, it falls back on *Orrin Fox* and *American Motors*:

> There is nothing in the record of this case sufficient to raise any doubt that the second paragraph serves precisely the same legitimate state interests served by the dealer protection statutes at issue in *[Orrin] Fox* and *American Motors*. Those explanations of the legitimate interest advanced by the second paragraph also describe the putative local benefits that flow from the second paragraph.

*Id.* at 37–38.

Only rarely have we doubted a statute's putative benefits, but we did, for example, when we concluded that the purported " 'ruinous' effects of competition" that a

statute aimed to combat were "entirely speculative." *Medigen, Inc. v. Pub. Serv. Comm'n*, 985 F.2d 164, 167 (4th Cir.1993). We do not discount the benefit of preventing oversaturation of the retail motorcycle market because it is not entirely speculative that existing dealers will suffer harm from excessive competition. The First Paragraph, however, provides this same benefit, and there is a serious question whether any additional benefit from the Second Paragraph is clearly exceeded by the added burdens.

As the district court recognized, the burdens of the Second Paragraph are severe. To begin with, the Second Paragraph is uniquely anti-competitive even as dealer protection laws go. Although the First Paragraph is a typical dealer protection statute, the Second Paragraph "has no parallel in the law of any other state," *Yamaha*, 276 F.Supp.2d at 495, and it creates a significant barrier to market entry, *see id.* at 500. Unlike the Second Paragraph, the dealer protection statutes in other states set geographic limitations on the protest rights of existing dealers; of the eleven other state statutes submitted in the record, ten limit protest rights to a market area radius of twenty miles or less. (One state allows the market area to be defined in the dealership agreement.)

The Second Paragraph creates a barrier to market entry because of the "virtual certainty" of a protest whenever a manufacturer attempts to authorize a new dealership. *Id.* at 502. "[E]ven a frivolous protest . . . could take years to resolve," the district court found. *Id.* at 501. In any event, the Commissioner has set quite a low threshold for what an existing dealer must show to trigger a formal evidentiary hearing; the dealer must only show that it represents the relevant line-make in a "not insignificant or insubstantial" way in the county, city, or town of the prospective dealer. J.A. 43. Thus, the district court found that with "the Commissioner's bias in favor of granting [a] hearing," a manufacturer "must assume that . . . it will be subjected to the full administrative process, the result of which can be contested in subsequent judicial proceedings." *Yamaha*, 276 F.Supp.2d at 501. Even if a formal hearing is denied, the existing dealer may pursue the matter in Virginia courts, "a process that could [go on for] years." *Id.*

In other states with dealer protection statutes, a manufacturer can reasonably anticipate the regions where it might be susceptible to a protest and can plan its expansion accordingly. In Virginia, however, a manufacturer has no way of avoiding the Second Paragraph's reach; targeting an underserved area of the Commonwealth will not spare it a protest. For example, an existing dealer in Virginia Beach could protest the establishment of a new dealership in Big Stone Gap, nearly 500 miles away. Thus, manufacturers cannot plan franchise expansion in Virginia as they can in other states; instead, they are forced to play a waiting game that could take years. The only business plan a manufacturer could implement would be to provide the statutorily required notice of a proposed dealership and then hunker down for a long fight.

The chilling effect of protests and potential protests on new dealership openings in Virginia has been established. Manufacturers incur significant costs, measured in both money and effort, in defending against protests, and this makes an attempt to open a new dealership in Virginia more burdensome than anywhere else. Even though "demand for motorcycles continues to increase," *id.* at 503, the "economic realities" of the Second Paragraph have caused both Yamaha and Harley–Davidson "to forego [all efforts to] estab-

lish[ ] new dealers in Virginia." *Id.* at 502. Instead, the two manufacturers will "devote their capital and business expansion efforts in other states." *Id.* "One consequence of the decisions by Yamaha and Harley–Davidson," the district court found, "is a relative reduction in intrabrand and interbrand competition." *Id.* at 503. The Second Paragraph will also deter would-be franchisees, who will not want to experience what happened to Harley–Davidson's prospective dealer in Prince George County, Virginia. That prospective dealer invested in a site, quit his job, and moved his family to Prince George County, only to be met with a Second Paragraph protest. The district court found that "the uncertainty surrounding the protest process makes it difficult for prospective dealers" to secure a dealership location, and a definite location is a prerequisite to the Second Paragraph's notice procedure. *Id.* at 502. As the district court said, because "protest is a virtual certainty," manufacturers will be reluctant to provide commitment letters, and without commitment letters, "prospective dealers are unlikely to be able to [obtain] the financing necessary to secure a location." *Id.* All of these circumstances led the district court to its central finding that the Second Paragraph "create[s] significant economic burdens chilling the opening of new dealerships." *Id.* at 514.

The district court held, however, that these "are not the type[s] of burdens the *Pike* test is meant to address." *Id.* The court, relying on dicta from a footnote in *Tracy,* said that *Pike* balancing applies only when a " 'generally nondiscriminatory' " state law " 'undermine[s] a compelling need for national uniformity in regulation.' " *Id.* (quoting *Tracy,* 519 U.S. at 299 n. 12, 117 S.Ct. 811). According to the district court, because the Second Paragraph does not regulate in an area where

there is a compelling need for national uniformity, the provision "creates no cognizable burdens on interstate commerce, and thus necessarily survives the *Pike* inquiry." *Id.*

We respectfully disagree with this analysis. *Pike* balancing is not limited to cases where state statutes interfere with a "compelling need for national uniformity in regulation." Cases decided under the dormant Commerce Clause sometimes invoke this principle, for example, where statutes "adversely affect interstate commerce by subjecting activities to inconsistent regulations." *CTS Corp.,* 481 U.S. at 88, 107 S.Ct. 1637. However, *Pike* balancing is conducted in situations where a need for national uniformity is not implicated. *See, e.g., Clover Leaf,* 449 U.S. at 472–74, 101 S.Ct. 715 (upholding statute prohibiting retailers from selling milk in plastic containers because the "minor" burden on interstate commerce was outweighed by "substantial" local benefits); *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 352–54, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (striking down statute requiring that all apple containers include in-state grading information in part because state could not justify it "in terms of the local benefits"); *Pike,* 397 U.S. at 142–46, 90 S.Ct. 844 (striking down statute requiring in-state packaging of cantaloupes prior to interstate shipment because legitimate state interests were outweighed by incidental burden on allocation of company's resources). As noted, *Tracy* 's footnote twelve is dicta: the Supreme Court acknowledged in the footnote that General Motors had brought only a first-tier (discrimination) challenge under the dormant Commerce Clause, 519 U.S. at 298 n. 12, 117 S.Ct. 811; the Court thus had no occasion to rule on the proper contours of a second-tier (*Pike* balancing) challenge. *Pike* balancing is therefore ap-

propriate in cases like this one, where interstate commerce is burdened by a state law that imposes barriers to market entry.

In proceeding with the *Pike* analysis, we note that the Second Paragraph not only imposes cognizable burdens on commerce, it imposes these heavy burdens predominantly on out-of-state interests. There are no motorcycle manufacturers located in Virginia. And existing motorcycle dealers, the major in-state interests affected by the provision, stand to benefit from the law's enforcement. The existing dealers cannot "be relied upon to prevent legislative abuse" because they "ha[ve] been mollified by" the economic protection they currently enjoy. *W. Lynn Creamery*, 512 U.S. at 200, 114 S.Ct. 2205. Indeed, the in-state interests actively seek to protect the burdensome law. In 2001 the Virginia Motorcycle Dealers Association asked each franchised dealer in the Commonwealth "to contribute at least $1000 to cover the legal fees for defending our 'best in the nation' franchise laws" and to cover the costs of lobbying the General Assembly. J.A. 827. Although those brave enough to try to open new dealerships are likely to be Virginia residents, these few individuals are sure to be outnumbered and out-gunned by the existing dealers. As a result, there is little political check against the possibility of legislative abuse in the form of motorcycle franchise laws that unduly burden commerce. *See Raymond Motor*, 434 U.S. at 444 n. 18, 98 S.Ct. 787.

The unnecessary and excessive breadth of the Second Paragraph persuades us that the statute's burdens clearly exceed its benefits. As for benefits, the district court could only approximate that "some number of existing dealers," who are outside the relevant market area protected by the First Paragraph but "serve the geographic market area of a hypothetical prospective dealer in a not insignificant way," might receive some protection on their investment and advertising "should the hypothetical dealer actually open." *Yamaha*, 276 F.Supp.2d at 512. Weighed against this weak benefit is a substantial burden, a barrier to market entry, that is unparalleled in scope. The Commonwealth has erected this barrier in the absence of evidence that protection in the form of statewide protest rights for every motorcycle dealer was needed. *See Medigen*, 985 F.2d at 167 (finding "no basis" for "concluding that competition in this market has had or will have any destructive effects"). The Commonwealth's only explanation for expanding the protection afforded by the First Paragraph is that motorcycle dealerships tend to sell within a forty-mile radius, which is beyond the First Paragraph's "relevant market" protection of a radius up to twenty miles. The Second Paragraph, of course, did not limit protest rights to dealers within a forty-mile radius of a proposed dealership; it imposed no limit at all. The *Pike* inquiry requires us to consider whether the Second Paragraph's benefits could have been achieved with a less restrictive alternative. We conclude that it could have. The Second Paragraph could have imposed some rational geographic limit on protest rights, but it did not. Under the Second Paragraph as it stands, an existing dealer at one end of Virginia can protest a proposed dealership some 500 miles away at the other end of the state. That is overreaching in the extreme. If we were to uphold the blanket statewide protection of the Second Paragraph, we would be giving Virginia the green light to extend similar protection to automobile dealers and franchisees of other product lines, thereby turning Virginia into an island of economic protectionism. If other states were to follow suit, it would jeopardize what the dormant Commerce Clause aims to preserve:

"a national [free] market for competition undisturbed by preferential advantages conferred by [individual] State[s] upon [their] residents or resident competitors." *Tracy,* 519 U.S. at 299, 117 S.Ct. 811. The dormant Commerce Clause places certain limits on protective regulation, and these limits have been exceeded in the Second Paragraph.

### III.

The Second Paragraph of Virginia Code § 46.2–1993.67(5) violates the dormant Commerce Clause by imposing an undue burden on interstate commerce. The judgment of the district court is therefore reversed, and the case is remanded for entry of judgment in favor of Yamaha.

*REVERSED AND REMANDED*